# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Case No. 13-13653 (DHS) |
| 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*, | Chapter 11 |
| Reorganized Debtors. | |
| THE NATIONAL LABOR RELATIONS BOARD AND THE NEW ENGLAND HEALTH CARE EMPLOYEES UNION, DISTRICT 1199, SEIU, | *Bankruptcy Appeal* <br><br> Civ. Action Nos. 14-CV-01725 (CCC), 14-CV-01726 (CCC), 14-CV-02057 (CCC), 14-CV-02058 (CCC), 14-CV-02353 (CCC) and 14-CV-02354 (CCC) |
| Appellants, <br> v. | |
| 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*, | |
| Appellees. | Hearing Date:  June 16, 2014 |

---

## BRIEF OF REORGANIZED DEBTORS IN SUPPORT OF MOTION TO DISMISS APPEALS AS EQUITABLY MOOT

---

**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07602-0800
(201) 489-3000
Michael D. Sirota
Counsel for 710 Long Ridge Road
Operating Company II, LLC, *et al.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... ii

PRELIMINARY STATEMENT ..................................................................... 3

BACKGROUND ............................................................................................ 8

ARGUMENT ................................................................................................ 17

A. THE APPEALS OF THE CONFIRMATION ORDER
SHOULD BE DISMISSED AS EQUITABLY MOOT ........................... 19

1. The Plan Has Been Substantially Consummated ................................. 19

a.  The Plan Has Been Substantially Consummated Within The
Meaning Of Section 1101(2) Of The Bankruptcy Code ............... 21

b.  Granting The Relief Requested By The Appellants Would
Undermine The Consummated Plan ............................................. 22

2. The Appellants Failed To Obtain A Stay ............................................. 32

3.  The Relief Requested By The Appellants Would Adversely Affect
The Rights Of Creditors And Other Third Parties Not Before The
Court ................................................................................................... 33

4.  The Relief Requested By The Appellants Would Threaten The
Success Of The Plan ........................................................................... 43

5. Finality In This Chapter 11 Reorganization Best Serves Public Policy
And Supports Equitable Mootness ...................................................... 45

B. THIS COURT SHOULD EXTEND THE DOCTRINE OF
EQUITABLE MOOTNESS TO DISMISS THE APPEALS OF
THE 1113 ORDERS AND CLAIMS OBJECTION ORDER ................ 46

CONCLUSION ............................................................................................ 56

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

ACC Bondholder Group v. Adelphia Commc'ns Corp. (In re Adelphia
   Commc'ns Corp.), 367 B.R. 84 (S.D.N.Y. 2007) ........................................24, 39

Ad Hoc Comm. of Class 7 Creditors v. Northwestern Corp. (In re
   Northwestern Corp.), No. 08-513, 2009 WL 2399120 (D. Del. Aug. 4,
   2009) ........................................................................................................................24

In re AOV Indus. Inc., 792 F.2d 1140 (D.C. Cir. 1986)..........................................22

In re Blue Diamond Coal Co., 160 B.R. 574 (E.D. Tenn. 1993) ..........47, 51, 52, 55

In re Blumer, 66 B.R. 109 (B.A.P. 9th Cir. 1986), aff'd, 826 F.2d 1069 (9th
   Cir. 1987)................................................................................................................35

In re Box Bros. Holding Co., 194 B.R. 32 (D. Del. 1996) ......................................28

Campania Int'l Financiera S.A. v. Calpine Corp. (In re Calpine Corp.), 390
   B.R. 508 (S.D.N.Y. 2008), aff'd, 354 F. App'x 479, 2009 WL 4066937
   (2d Cir. 2009)...................................................................................................24, 36

In re Chateaugay Corp., 988 F.2d 322 (2d Cir. 1993)...............................................3

In re Continental Airlines, 91 F.3d 553 (3d Cir. 1996) ...................................passim

In re Dura Auto. Sys., Inc., 403 B.R. 300 (D. Del. 2009) .....................29, 34, 39, 44

Estate of Asman v. Old Bridge Chemicals, Inc., 2006 WL 2990366 (D.N.J.
   Oct. 18, 2006) ...................................................................................3, 27, 28, 29

In re Grand Union Co., 200 B.R. 101 (D. Del. 1996) .............................................33

Grimes v. Genesis Health Ventures, Inc. (In re Genesis Health Ventures,
   Inc.), 280 B.R. 339 (D. Del. 2002).........................................................24, 26, 45

High River Ltd. P'ship v. Trans World Airlines, Inc. (In re Trans World
   Airlines, Inc.), No. 01-226, 2002 WL 500569 (D. Del. Mar. 26, 2002)............39

In re Highway Truck Drivers & Helpers Local Union # 107, 888 F.2d 293
        (3d Cir. 1989)..................................................................................33

In re HNRC Dissolution Co., No. 04-158 (HRW), 2005 WL 1972592 (E.D.
        Ky. Aug. 16, 2005) ....................................................................47, 49

In re Innovative Clinical Solutions, Ltd., 302 B.R. 136 (Bankr. D. Del. 2003)......29

In re Manges, 29 F.3d 1034 (5th Cir. 1994) .......................................................38, 39

Miami Ctr. Ltd. P'ship v. Bank of N.Y., 838 F.2d 1547 (11th Cir. 1988)..............22

Nordhoff Invs., Inc. v. Zenith Elecs. Corp.
        258 F.3d 180 (3d Cir. 2001) ...........................................................passim

In re Ormet Corp., et al., No. 2:04-CV-1151, 2005 WL 2000704 (S.D. Ohio
        Aug. 19, 2005) ..........................................................................47, 54

In re Phila. Newspapers, LLC, 690 F.3d 161 (3d Cir. 2012) ....18, 19, 23, 34, 44, 45

In re Polaroid Corp., 2004 WL 2223301 (D. Del. 2004)........................................29

In re PWS Holding Corp., 228 F.3d 224 (3d Cir. 2000) .........................................20

Quad/Graphics, Inc. v. One2One Commc'ns, LLC, 2013 WL 3864056
        (D.N.J. July 24, 2013)...............................................................3, 18, 20

R2 Invs., LDC v. Charter Commc'ns, Inc. (In re Charter Commc'ns, Inc.),
        691 F.3d 476 (2d Cir. 2012) .................................................................26

In re Roberts Farms, Inc., 652 F.2d 793 (9th Cir. 1981) ...................................38, 49

Samson Energy Res. Co. v. Semcrude, L.P. (In re Semcrude, L.P.), 728 F.3d
        314 (3d Cir. 2013).......................................................................passim

Schroeder v. New Century Liquidating Trust (In re New Century TRS
        Holdings, Inc.), 407 B.R. 576 (D. Del. 2009) .....................................24

In re SGPA, Inc., 34 Fed. Appx. 49, 2002 WL 827176 (3d Cir. Apr. 26,
        2002) ................................................................................................18

In re SLI, Inc., 2004 WL 2346021 (D. Del. Oct. 5, 2004) .................................28, 29

iii

In re Spansion, Civil Action No. 10-369 (RBK), 2011 WL 3420441 (D. Del. Aug. 4, 2011) ..........................................................................................22, 24, 39

In re U.S. Airways Group, Inc., 369 F.3d 806 (4th Cir. 2004)..........................52, 53

U.S. Tr. v. Official Comm. of Equity Sec. Holders (In re Zenith Elecs. Corp.), 329 F.3d 338 (3d Cir. 2003)..................................................20, 23, 24, 32

United Artists Theatre Co. v. Walton, 315 F.3d 217 (3d Cir. 2003).......................32

**STATUTES**

11 U.S.C. § 507(a)(4)..........................................................................................11

11 U.S.C. § 507(a)(5)..........................................................................................11

11 U.S.C. § 524(e) ..............................................................................................31

11 U.S.C. § 1101(2)(A)........................................................................................21

11 U.S.C. § 1101(2)(B)........................................................................................21

11 U.S.C. § 1101(2)(C)........................................................................................22

11 U.S.C. § 1113(b) .......................................................................................10, 11

11 U.S.C. § 1113(c) .............................................................................................11

11 U.S.C. § 1124(2) ............................................................................................16

11 U.S.C. § 1129(a)(7).........................................................................................31

28 U.S.C. § 157(b)(1) ..........................................................................................31

710 Long Ridge Road Operating Company II, LLC d/b/a Long Ridge of Stamford, 240 Church Street Operating Company II, LLC d/b/a Newington Health Care Center, 1 Burr Road Operating Company II, LLC d/b/a Westport Health Care Center, 245 Orange Avenue Operating Company II, LLC d/b/a West River Health Care Center and 107 Osborne Street Operating Company II, LLC d/b/a Danbury Health Care Center, the reorganized debtors in the above-captioned chapter 11 case and appellees before this Court (the "**Appellees**"), file this brief in support of their motion to dismiss (the "**Motion**") the above-captioned appeals (the "**Appeals**") filed by the National Labor Relations Board (the "**NLRB**") and the New England Health Care Employees Union, District 1199, SEIU (the "**Union**," and together with the NLRB shall be referred to herein collectively as, the "**Appellants**") of the following orders entered by the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**") as equitably moot:

> 1.    March 4, 2013 order [Bankr. Case No. 13-13653, Docket No. 66] (the "**First 1113(e) Order**") granting the Appellees relief under Section 1113(e) of title 11 of the United States Code (the "**Bankruptcy Code**");
>
> 2.    April 10, 2013 order [Bankr. Case No. 13-13653, Docket No. 230] (the "**Second 1113(e) Order**") granting the Appellees continued relief under Section 1113(e) of the Bankruptcy Code;
>
> 3.    July 15, 2013 order [Bankr. Case No. 13-13653, Docket No. 424] (the "**Third 1113(e) Order**") granting the Appellees continued relief under Section 1113(e) of the Bankruptcy Code;

4.      November 22, 2013 order [Bankr. Case No. 13-13653, Docket No. 706] (the "**Fourth 1113(e) Order**," and together with the First 1113(e) Order, Second 1113(e) Order and Third 1113(e) Order shall be referred to herein collectively as, the "**1113(e) Orders**") granting the Appellees continued relief under Section 1113(e) of the Bankruptcy Code;

5.      February 3, 2014 order [Bankr. Case No. 13-13653, Docket No. 898] (the "**1113(c) Order**," and together with the 1113(e) Orders shall be referred to herein collectively as, the "**1113 Orders**") authorizing the Appellees to reject the continuing economic terms of the expired collective bargaining agreements with the Union pursuant to Section 1113(c) of the Bankruptcy Code;

6.      February 6, 2014 order [Bankr. Case No. 13-13653 (DHS), Docket No. 921] disallowing and reclassifying certain claims filed by the NLRB (the "**Claims Objection Order**"); and

7.      March 6, 2014 order [Bankr. Case No. 13-13653 (DHS), Docket No. 989] (the "**Confirmation Order**," and together with the 1113 Orders and the Claims Objection Order shall be referred to herein collectively as, the "**Orders**") confirming the Appellees' *First Amended Joint Chapter 11 Plan of Reorganization of 710 Long Ridge Road Operating Company II, LLC, et al.* dated December 10, 2013 [Case No. 13-13653 (DHS), Docket No. 759] (as modified, the "**Plan**"). [1]

In support of the Motion, the Appellees submit the Declaration of Victor Matthew Marcos (the "**Marcos Declaration**") and rely on the Declaration of Akim J. Grate, Senior Vice President of Capital One, N.A. (the "**Grate Declaration**"),

---

[1] All capitalized terms used but not otherwise defined herein shall have the same meanings ascribed to them in the Plan.

2

which have both been filed contemporaneously herewith.[2]  In further support of the
Motion, the Appellees state as follows:

## **PRELIMINARY STATEMENT**

The Appeals should be dismissed as equitably moot because a successful
appeal would be fatal to the Plan, leading to a perverse outcome including, but not
limited to, injury to third parties who have relied on the Plan and the finality of
these Chapter 11 cases, the closing of five (5) facilities that care for the elderly,
relocation of sick and frail elderly patients, and termination of hundreds of
employees.

In the Third Circuit, it is well-established that "'[a]n appeal should … be
dismissed as moot when, even though effective relief could conceivably be
fashioned, implementation of that relief would be inequitable.'"  In re Continental
Airlines, 91 F.3d 553, 559 (3d Cir. 1996) (quoting In re Chateaugay Corp., 988
F.2d 322, 325 (2d Cir. 1993)); see also Quad/Graphics, Inc. v. One2One
Commc'ns, LLC, 2013 WL 3864056, *4 (D.N.J. July 24, 2013) (citing
Continental); Estate of Asman v. Old Bridge Chemicals, Inc., 2006 WL 2990366,
*2 (D.N.J. Oct. 18, 2006) (same).  The Court of Appeals has identified five factors[3]

---

[2]The Grate Declaration has been filed by Teich Groh, counsel to Capital
One, N.A.

[3]As discussed in further detail herein, the "prudential factors" set forth in the
Third Circuit's decision in Continental are: (1) whether the reorganization plan has

3

to be applied when determining whether to dismiss an appeal of a bankruptcy confirmation order as equitably moot.  Here, all five of these factors strongly weigh in favor of this Court exercising prudential forbearance and declining to hear the merits of the Appeals.

First, it is irrefutable that the Plan has been substantially consummated (whether viewed from a statutory perspective or by virtue of the express terms of the Plan and the Confirmation Order).  Pursuant to the Plan, on or shortly after March 7, 2014 (the "**Effective Date**"), the Appellees consummated and implemented, or commenced consummating and implementing, the various transactions contemplated in the Plan.  For example, among other things, on March 7, 2014, the Appellees closed on exit financing that was used to retire the Appellees' debtor-in-possession financing and provide working capital going forward.  In addition, each of the Appellees issued and delivered to Care Realty, LLC the New Membership Interests, transferring ownership of the entities to Care Realty, LLC, for which Care Realty, LLC was required to, and did, obtain approvals from the Connecticut Department of Health and the United States Department of Housing and Urban Development ("**HUD**").  On and after the

---

been substantially consummated, (2) whether a stay has been obtained, (3) whether the relief requested would affect the rights of parties not before the court, (4) whether the relief requested would affect the success of the plan, and (5) the public policy of affording finality to bankruptcy judgments.  In re Continental Airlines, 91 F.3d at 560.

4

Effective Date, the Appellees paid millions of dollars in priority, administrative

expense, professional compensation and Allowed Ongoing Trade Vendor Claims

in Class 5, assumed or rejected hundreds of contracts, entered into sixty-one (61)

Ongoing Trade Vendor Agreements with the Ongoing Trade Vendors and

implemented many other transactions with third parties.  Because the Plan has now

been substantially consummated, and because granting the relief requested by the

Appellants would substantially undermine and unravel the key elements of the Plan

– causing immeasurable harm to numerous parties who have acted in reliance on

the Confirmation Order and finality of the Plan – it would be inequitable to

proceed with the adjudication of the Appeals.

Second, this Court denied the Appellants' request for a stay pending appeal,

which the Appellants themselves have acknowledged would likely render the

Appeals moot.  Having failed to obtain a stay of the Confirmation Order, the Plan

now has been substantially consummated and, in reliance on the Confirmation

Order and the expiration of all applicable stays, the Appellees have engaged in

many transactions that simply cannot be undone.

Third, numerous parties not before this Court, including creditors who

received distributions, executory contract counterparties that received cure

amounts, Care Realty, LLC, one of the parties to the Plan Sponsor Group and

Backstop Funder who now holds the New Membership Interests in the Appellees,

5

the Appellees' new patients, vendors and employees, and other parties, have acted in reliance on the confirmed Plan and the Confirmation Order since the Effective Date. The reversal and rescission sought by the Appellants would, even if feasible, impair the rights of those third parties and be highly inequitable. There is simply no effective or equitable way to put these parties back in the positions that they were in prior to the Effective Date.

Fourth, the relief requested by the Appellants would substantially undermine, and indisputably unravel, the key elements of the Plan, including the integral Backstop Funding Agreement and other resolutions embodied in the Plan, which are the product of arms'-length negotiations and compromise between and among the Appellees, the Official Committee of Unsecured Creditors (the "**Committee**") and the Plan Sponsor Group, who agreed to provide substantial additional consideration and waive significant claims in order to effectuate the transactions in the Plan. No effective or equitable relief can be given without eviscerating the Plan in its entirety or in significant part.

Fifth, dismissal of the Appeals would serve the strong public interest in encouraging reliance on confirmation orders and finality in Chapter 11 cases and avoiding the costs and chaos that would ensue if the Plan was unwound. There are no unique issues in the Appeals that implicate contrary public policy concerns.

6

Finally, reversal of the 1113 Orders and/or Claims Objection Order is tantamount to reversal of the Confirmation Order and evisceration of the Plan. It is true that the equitable mootness doctrine applies most often to appeals of confirmation orders. Courts, however, have extended the doctrine to appeals of other types of bankruptcy court orders, where the subject matter of the order is integral to the plan of reorganization. A condition precedent to confirmation of the Plan in this case was the entry of the 1113(c) Order and the Plan could not have been confirmed without the relief provided in the Claims Objection Order. Those orders positioned the Appellees to obtain exit financing and successfully emerge from Chapter 11. Reversal of the 1113 Orders and/or Claims Objection Order would undermine the Plan and eviscerate the Appellees' viability.[4] Accordingly, this Court should invoke the doctrine of equitable mootness and also dismiss the Appeals of the 1113 Orders and/or Claims Objection Order to protect the interests of third parties who relied on those orders and the finality of these cases.[5]

---

[4]The Appellants recognize the extent to which the Confirmation Order, 1113 Orders and Claims Objection Order are intertwined and, on that basis, moved for consolidation of the Appeals. The Court, in its May 15, 2014 Order (the "**Consolidation Order**"), likewise recognized that consolidation of the Appeals was appropriate based on the presence of common questions of law and fact. See Order, Civ. Action No. 14-CV-01726 (CCC), at Docket No. 9, p. 1.

[5]Failure to dismiss the Appeals could result in *de facto* reversal of the Confirmation Order since reversal of the 1113(c) Order or the Claims Objection Order will cause the Plan to fail, resulting in all of the harms which make dismissal of the Appeals appropriate.

Accordingly, no effective or equitable relief can be granted to Appellants in the Appeals. Thus, the Appeals should be dismissed with prejudice as equitably moot.

## BACKGROUND

Each Appellee operates an inpatient skilled nursing facility located in the state of Connecticut. Prior to the commencement of these cases, the Appellees were plagued with unworkably high labor costs under collective bargaining agreements covering their unionized workforce, primarily in the form of free pensions and free medical benefits obligations, negatively impacting the Appellees' ability to service their patients. Those unworkable labor costs caused these Appellees to seek Chapter 11 relief in 2004 and again on February 24, 2013 (the "**Petition Date**").

Whether the Appellees could achieve long-term viability, and even short-term operational sustainability, depended directly and substantially on the Appellees' ability to achieve dramatic changes to their labor agreements, with a corresponding material reduction in their cost structure and pension and medical obligations. Toward that end, almost immediately, the Appellees moved in the Bankruptcy Court to implement interim modifications to their expired collective bargaining agreements with the Union under Section 1113(e) of the Bankruptcy Code because their facilities were unable to sustain themselves given the existence

8

of uneconomic provisions in the collective bargaining agreements, which constituted a crushingly high percentage of the Appellees' gross revenues and materially exceeded market averages.

On March 4, 2013, April 10, 2013, July 15, 2013 and November 22, 2013, the Bankruptcy Court entered four successive 1113(e) Orders authorizing the Appellees to implement interim modifications to their expired collective bargaining agreements with the Union, which were essential to the continuation of the Appellees' business and necessary to avoid irreparable damage to their bankruptcy estates.  See Case No. 13-13653 (DHS), Docket Nos. 66, 230, 424 and 706.

Further, while the Section 1113(e) relief was in place, the Appellees endeavored to negotiate in good faith with the Union and embarked on a momentous process to permanently address the unsustainable labor obligations to their unionized workforce in order to enable the Appellees to emerge from Chapter 11.  Despite the aim of the Section 1113(c) process, the Union refused to meet to negotiate after the filing of the Chapter 11 cases, continuing what had been a pre-Petition Date stance of intransigence.  Indeed, despite the Appellees providing significant discovery and information to the Union as part of the Section 1113(c) process, the Union, instead of resuming negotiations as promised, rebuffed all efforts to sit down, and made additional requests for information, much of which

9

was irrelevant to the collective bargaining process and was, instead, targeted towards proving claims against non-Appellee entities who were not and never were parties to the collective bargaining agreements.

Although the Union promised to resume negotiations once requested documents were provided, after those documents were provided, the Union, with the support of the NLRB, then refused to negotiate unless the Appellees agreed to forgo the Section 1113(e) relief and reinstate the uneconomic terms of the collective bargaining agreements, even though the unrefuted evidence was that without the Section 1113(e) relief, the Appellees would have to close down and all employees would lose their jobs.

After the Union's intransigence became wholly counterproductive, the Appellees moved to reject the economic terms of the collective bargaining agreements and implement the Appellees' proposal under 11 U.S.C. § 1113(b) in order to emerge from Chapter 11 and avoid a shut down of their operations to the detriment of their frail and elderly patients, employees, creditors and stakeholders.[6]

On February 3, 2014, after extensive testimony and oral argument, the Bankruptcy Court issued an opinion and the 1113(c) Order (i) rejecting the

---

[6]The Appellees' proposal was accompanied by the detailed information required by Section 1113(b) of the Bankruptcy Code. The Union sought clarification of that information and requested additional information. Even after this additional information was provided, the Union refused to meet to discuss the proposal. Remarkably, the NLRB supported the Union's refusal to negotiate.

10

continuing economic terms of the expired collective bargaining agreements with the Union under 11 U.S.C. § 1113(c), and (ii) implementing the terms of the Appellees' proposal under 11 U.S.C. § 1113(b). <u>See</u> Case No. 13-13653 (DHS), Docket Nos. 897 and 898.

In addition, on February 6, 2014, the Bankruptcy Court entered the Claims Objection Order, which (i) reclassified as general unsecured claims, if and when awarded in a NLRB proceeding and to the extent that they were filed or asserted as priority claims under 11 U.S.C. § 507(a)(4) and/or 11 U.S.C. § 507(a)(5), the claims of the Appellants that relate to the period preceding the Petition Date, and (ii) expunged the claims attributable to the time period of March 3, 2013 to February 3, 2014 in their entirety. <u>See</u> Civil Action Nos. 14-cv-02057 and 14-cv-02058.

The 1113 Orders and Claims Objection Order enabled the Appellees to proceed with the hearings on confirmation of the Plan and emerge from Chapter 11. On February 10, 2014 and February 19, 2014, the Bankruptcy Court conducted hearings on confirmation of the Plan. On March 5, 2014, the Bankruptcy Court issued an opinion confirming the Plan, provided the Appellees made certain modifications thereto (the "**Opinion on Confirmation**"). <u>See</u> Case No. 13-13653 (DHS), Docket No 983. After the Appellees agreed to those modifications, on March 6, 2014, the Bankruptcy Court entered the Confirmation Order. At every

11

step of the way, the Appellants fought against confirmation and consummation of the Plan, and now advance before this Court the same arguments considered at length and rejected by the Bankruptcy Court in its extensive and detailed Opinion on Confirmation.

The cornerstone of the Plan is the Plan Sponsor Group's and Backstop Funder's agreement to (i) waive $31 million in claims against the Appellees and their estates, (ii) waive $13 million in cure payments, (iii) fund the $500,000 Plan Distribution Contribution Amount (and up to $5,000,000 in the event the NLRB obtains a final non-appealable judgment against the Appellees on the Backpay Claims in the ALJ Proceedings), (iv) back-stop obligations set forth in the Plan, including distributions to Allowed Class 5 Claims in the amount of $3 million, and (v) make such funds available to the applicable Appellee to meet operating shortfalls post-Effective Date in the amount of approximately $8 million.

Those undertakings, which were made in the face of continued litigation with the NLRB, appeals of every decision made by the Bankruptcy Court and the extensive post-confirmation operating losses, are the product of arms'-length negotiations and the substantial investment of time and money by the Plan Sponsor Group, Backstop Funder, the Appellees and the Committee. The significant contributions from the Plan Sponsor Group and Backstop Funder permitted the Appellees to emerge from Chapter 11 as reorganized operating entities, preserving

12

thousands of jobs and existing business relationships with vendors, and avoiding the relocation of hundreds of frail and elderly patients.

On March 6, 2014, the NLRB filed a notice of appeal of the Confirmation Order and a motion to stay the Confirmation Order pending appeal. See Case No. 13-13653 (DHS), Docket Nos. 991 and 992.[7] On March 7, 2014, the Appellees filed opposition to the NLRB's request for a stay of the Confirmation Order pending appeal. See Case No. 13-13653 (DHS), Docket No. 998. On that same date, the Bankruptcy Court denied the NLRB's request for a stay of the Confirmation Order pending appeal finding (1) the appeal is not likely to succeed on the merits, (2) the NLRB will not suffer irreparable harm if the stay is not granted, (3) a stay will prejudice and substantially harm other parties, and (4) a stay is not in the public interest. See Order, Case No. 13-13653 (DHS), Docket No. 999.

Following the denial of the NLRB's initial motion for a stay of the Confirmation Order, the NLRB filed a motion for a stay in the District Court on March 10, 2014. See Civil Action No. 14-cv-01542. The District Court heard oral argument that same day. On March 21, 2014, the District Court issued an opinion

---

[7]The Union, for whom the NLRB really sought the stay, failed to join in the request, of course to avoid posting a multi-million dollar bond pursuant to Fed. R. Bankr. P. 8005.

13

(the "**Opinion**") denying the NLRB's motion for a stay pending appeal, <u>see</u> Civil

Action No. 14-cv-01542, Docket No. 13, finding the following:

> Were the Court to grant a stay in this case, it appears
> from the evidence presented both in the papers and
> before the Bankruptcy Court that the Appellees,
> operators of long-term nursing care facilities, their
> creditors, and their patients would all suffer significant, if
> not disastrous harm.

<u>See</u> Opinion, p. 2.

> The NLRB has presented no evidence to either this Court
> or the Bankruptcy Court to support its argument.
> Appellant's entire argument consists of conjectural
> statements which, contrasted with the sworn testimony
> and declarations put forth by the Appellees, must fail.

<u>See</u> Opinion, p. 4.

> Appellant's arguments [concerning irreparable harm to
> the NLRB] are unavailing.

<u>See</u> Opinion, p. 5.

> Notwithstanding Appellant's argument that some
> uncertainty exists as to the law applied by Judge
> Steckroth, any likelihood of success that may be present
> is insufficient, and this Court is not willing to implement
> the drastic relief provided by a stay absent a stronger
> showing.

<u>See</u> Opinion, p. 7.

> [G]ranting an order that would put many of the very
> workers the NLRB seeks to help in danger of
> permanently losing their jobs protects neither the workers
> themselves nor the public interest.

<u>See</u> Opinion, pp. 7-8.

Following confirmation and the Bankruptcy Court's denial of the NLRB's requests for a stay of the Confirmation Order, on March 7, 2014, the Plan became "effective."[8] On or shortly after the Effective Date, the Plan was substantially consummated. As more fully described in the Marcos Declaration, the following actions, among others, have been taken or have occurred since the Effective Date:

1.   Appellees' assets revested in Appellees, as reorganized debtors.

2.   Appellees' governing documents were amended.

3.   Hundreds of contracts and leases were assumed or rejected.

4.   As part of the assumption of the executory contracts and unexpired leases, on March 7, 2014, the Appellees paid $272,254.28 in cure costs under Section 365(b)(1)(A) of the Bankruptcy Code.

5.   Appellees closed on their exit facility, which was used to satisfy their debtor-in-possession facility, and provide working capital going forward. The Appellees continue to draw on their exit facility. In connection with the exit facility, the Appellees were required to execute, among other things, the credit agreement, security agreement, revolving note, pledge agreement, intercreditor agreement, several deposit account control agreements, management fee subordination agreement and rent subordination agreement.

6.   Appellees paid millions of dollars in priority, administrative expense, professional compensation and Allowed Ongoing Trade Vendor Claims in Class 5.

7.   In connection with "curing" the defaults under their respective pre-petition financing agreements with M&T Bank ("**M&T**") and Housing & Healthcare Finance LLC insured by HUD, to "reinstate" those loans under the Plan pursuant to 11 U.S.C. § 1124(2), on March 7, 2014, the Appellees paid M&T's and HUD's counsel fees in the amount of approximately $543,000.

---

[8]The Appellees' debtor-in-possession financing was set to expire and the Plan becoming "effective" was a condition to closing on the Appellees' permanent exit financing.

15

8.      On the Effective Date, the Plan Sponsor Group advanced the $500,000 on account of the Plan Distribution Contribution Amount.

9.      In March 2014, Care Realty, LLC contributed $575,000 to cover operating shortfalls.  In April 2014, Care Realty, LLC contributed $653,000 to cover operating shortfalls.  The Appellees project that in May 2014, Care Realty, LLC will be required to contribute approximately $200,000 to cover operating shortfalls.

10.     All of Appellees' pre-petition equity interests were terminated and the New Membership Interests were assigned to Care Realty, LLC.

11.     The Appellees received the required approval from the Connecticut Department of Health and from HUD with respect to the transfer of ownership to Care Realty, LLC.

12.     Significant intercompany claims were cancelled.

13.     Pursuant to the Plan, the Debtors have executed sixty-one (61) Ongoing Trade Vendor Agreements with the Ongoing Trade Vendors, and these third-party Ongoing Trade Vendors modified their terms with the Appellees, in the form of the Extended Terms and Credit provided by such agreements (and thereby substantially increasing their risk of repayment from the Appellees).

14.     On the Effective Date, the Appellees entered into new management agreements with Care Group, L.L.C., a wholly-owned subsidiary of Care Realty, L.L.C.  Under the management agreements, the Appellees are obligated to pay a 5% management fee to Care Group, L.L.C.  The Appellees made their first payment in the amount of $237,182 (for the period March 7, 2014 through and including March 31, 2014) on April 1, 2014.  The Appellees made their second payment in the amount of $280,517.87 on May 1, 2014.

15.     Numerous other vendors, customers and other persons and entities have commenced, modified or expanded their business relationships with Appellees in reliance on the Plan and the successful conclusion of the Chapter 11 case.

16.     Appellees have further developed relationships with several parties that refused to maintain or extend any relationship with Appellees during the pendency of the Chapter 11 cases.

## **ARGUMENT**

In light of, among other reasons, the substantial consummation of the Plan and the inequity of impacting third parties who, in reliance on confirmation of the Plan, have engaged in transactions with the post-emergence Appellees, the Appeals should be dismissed as equitably moot.  Granting the relief requested by the Appellants would result in the unraveling of the consummated Plan, an outcome potentially impossible to implement and certainly inequitable to the Appellees and their creditors, the Plan Sponsor Group, Backstop Funder, patients, vendors, employees and other stakeholders in the successful reorganization of the Appellees.

As Judge Linares recently observed, courts in the Third Circuit consider the following five factors when determining whether to dismiss an appeal of a confirmation order as equitably moot: "(1) whether the reorganization plan has been substantially consummated, (2) whether a stay has been obtained, (3) whether the relief requested would affect the rights of parties not before the court, (4) whether the relief requested would affect the success of the plan, and (5) the public policy of affording finality to bankruptcy judgments." One2One, 2013 WL 3864056, *4-5 (citing Continental, 91 F.3d at 560); see also In re Phila. Newspapers, LLC, 690 F.3d 161, 168 (3d Cir. 2012).  This so-called "equitable mootness" doctrine "prevents a court from unscrambling complex bankruptcy

17

reorganizations when the appealing party should have acted before the plan became extremely difficult to retract." Nordhoff Invs., Inc. v. Zenith Elecs. Corp., 258 F.3d 180, 185 (3d Cir. 2001). Not all five factors need be present in order to dismiss an appeal as equitably moot. See, e.g., In re SGPA, Inc., 34 Fed. Appx. 49, 2002 WL 827176, at ** 1-2 (3d Cir. Apr. 26, 2002). Rather, "factors are given varying weight, depending on the particular circumstances." Nordhoff, 258 F.3d at 185 (internal citation and quotation omitted).[9]

In addition, these factors are interconnected and overlapping. Phila. Newspapers, 690 F.3d at 168-69. "The second factor principally duplicates the first 'in the sense that a plan cannot be substantially consummated if the appellant has successfully sought a stay.'" Id. at 169 (quotation marks and citation omitted). In analyzing the first factor, courts have asked "whether allowing an appeal to go forward will undermine the plan, and not merely whether the plan has been substantially consummated under the Bankruptcy Code's definition." Id. at 168-69 (citation omitted). This collapses the first and fourth factors. The third factor adds an additional consideration—whether granting relief will undermine "the reliance of third parties, in particular investors, on the finality of [plan confirmation]." Id. at 169 (quotation marks and citation omitted). "Finally, the fifth factor supports

_____

[9]The Appellees, as the moving parties, carry the burden of demonstrating equitable mootness. See Samson Energy Res. Co. v. Semcrude, L.P. (In re Semcrude, L.P.), 728 F.3d 314, 321 (3d Cir. 2013).

18

the other four by encouraging investors and others to rely on confirmation orders, thereby facilitating successful reorganizations by fostering confidence in the finality of confirmed plans." Id.

The Third Circuit in Semcrude teaches that analyzing equitable mootness should proceed in two analytical steps: (1) whether a confirmed plan has been substantially consummated; and (2) if so, whether granting the relief requested in the appeal will (a) fatally scramble the plan and/or (b) significantly harm third parties who have justifiably relied on plan confirmation. Semcrude, 728 F.3d at 321. If this threshold is satisfied, a court should continue to the next step in the analysis. Id. That is, it should look to whether granting relief will require undoing the plan as opposed to modifying it in a manner that does not cause its collapse. Id.

## A.   THE APPEALS OF THE CONFIRMATION ORDER SHOULD BE DISMISSED AS EQUITABLY MOOT

In the present case, all five Continental factors strongly support dismissal of the Appeals of the Confirmation Order as equitably moot.

### 1.   The Plan Has Been Substantially Consummated

"Whether the plan has been substantially consummated, is typically the 'foremost consideration'" under the equitable mootness doctrine. One2One, 2013 WL 3864056, *5 (citing In re PWS Holding Corp., 228 F.3d 224, 236 (3d Cir. 2000); Continental, 91 F.3d at 560). The analysis regarding substantial

19

consummation is straightforward. Courts first consider whether "substantial

consummation" has occurred within the meaning of Section 1101(2) of the

Bankruptcy Code.[10]  Continental, 91 F.3d at 561. Courts then may also weigh

whether, in the wake of the plan's substantial consummation, allowing an appeal to

proceed might undermine or unravel the plan. See U.S. Tr. v. Official Comm. of

Equity Sec. Holders (In re Zenith Elecs. Corp.), 329 F.3d 338, 346 (3d Cir. 2003).

In this case, the answer to both of these questions is overwhelmingly yes.[11]

---

[10]"Substantial consummation" is defined in the Code as:

(A) transfer of all or substantially all of the property proposed by the plan to
be transferred;
(B) assumption by the debtor or by the successor to the debtor under the plan
of the business or of the management of all or substantially all of the property dealt
with by the plan; and
(C) commencement of distribution under the plan.

11 U.S.C. § 1101(2).

[11]It should also be noted that the Plan has been substantially consummated in
accordance with the terms of the Plan and the Confirmation Order. Section 11.10
of the Plan provides as follows: "Upon the Debtors making the payments required
on the Effective Date, the Plan shall be deemed to be substantially consummated
under sections 1101 and 1127(b) of the Bankruptcy Code." As noted above, the
Appellees have made all of the payments required on the Effective Date.
Similarly, the Confirmation Order provides, at paragraph 37, that "[t]he substantial
consummation of the Plan, within the meaning of sections 1101 and 1127 of the
Bankruptcy Code, is deemed to occur on the Effective Date." Clearly, the Plan has
been substantially consummated in accordance with the express provisions of the
Plan and the Confirmation Order.

20

a.   The Plan Has Been Substantially Consummated Within The
Meaning Of Section 1101(2) Of The Bankruptcy Code

On the record before this Court, it is crystal clear that the Plan has been

substantially consummated within the meaning of Section 1101(2) of the

Bankruptcy Code.  As detailed in the Marcos Declaration, and summarized above,

on or shortly after the Effective Date:

- The Appellees "transferred all or substantially all of the property
  proposed by the plan to be transferred." 11 U.S.C. § 1101(2)(A). In
  particular, (i) all payments required to be made on the Effective Date
  were made, (ii) on the Effective Date, the Appellees issued the New
  Membership Interests to Care Realty, LLC, and (iii) all property of the
  Appellees revested in the Appellees pursuant to the Plan. See Marcos
  Declaration, ¶¶ 9, 12-13.

- The Appellees "assum[ed] … the business of or … management of all or
  substantially all of the property dealt with by the plan." 11 U.S.C. §
  1101(2)(B).  Under the Plan, each Appellee issued and delivered to Care
  Realty, LLC the New Membership Interests.  See Marcos Declaration, ¶
  14.  In accordance therewith, on March 7, 2014, each of the Appellees
  executed an Amended and Restated Operating Agreement to reflect that
  Care Realty, LLC was the holder of the New Membership Interests in the
  Appellees.  Id.  Further, by operation of the Plan, on the Effective Date,
  all of Appellees' old equity interests were terminated.  Id.  Further, the
  Appellees received approval from the Connecticut Department of Health
  and from HUD with respect to Care Realty, LLC owning the New
  Membership Interests in the Appellees effective as of the Effective Date.
  Id. , ¶ 15.  Since that time, Appellees have been managing their
  businesses and assets as reorganized debtors.

- Finally, the reorganized debtor has "commence[d] distribution under the
  plan." 11 U.S.C. § 1101(2)(C).  In fact, other than the distributions that
  are permitted to be made over time and, thus, not yet payable, the
  Appellees have completed all distributions and payments contemplated
  by the Plan.  See Marcos Declaration, ¶ 10.  The Appellees have made
  several distributions under the Plan since the Effective Date, including (i)

21

approximately $210,000 in cash on account of allowed priority and administrative expense claims, (ii) approximately $1,595,000 in payments to professionals pursuant to approved final fee applications, (iii) approximately $543,000 to satisfy M&T's and HUD's counsel fees, (iv) $485,000 in payments on account of Allowed Ongoing Trade Vendor Claims in Class 5, and (v) $272,254.28 in cure costs under Section 365(b)(1)(A) of the Bankruptcy Code. Id.[12]

In short, there is no question that the Plan has been substantially consummated within the meaning of the Bankruptcy Code. When the Plan has been substantially consummated, there is "a strong presumption of mootness." Miami Ctr. Ltd. P'ship v. Bank of N.Y., 838 F.2d 1547, 1555 (11th Cir. 1988) (quoting In re AOV Indus. Inc., 792 F.2d 1140, 1149 (D.C. Cir. 1986)).

### b. Granting The Relief Requested By The Appellants Would Undermine The Consummated Plan[13]

Courts also consider "the probability that granting the appeal would unravel the plan, upon which numerous parties were at that point in reliance." See Zenith, 329 F.3d at 344 (considering what reversal of a confirmation order would mean to parties who had relied on the order). Indeed, courts consider whether an

---

[12]Completion of substantially all of the applicable plan distributions to the creditor body is often cited in favor of equitable mootness. See In re Spansion, Civil Action No. 10-369 (RBK), 2011 WL 3420441 (D. Del. Aug. 4, 2011).

[13]As mentioned briefly above, in analyzing the first factor, courts have asked "whether allowing an appeal to go forward will undermine the plan, and not merely whether the plan has been substantially consummated under the Bankruptcy Code's definition." Phila. Newspapers, 690 F.3d at 168-69. This collapses the first and fourth factors. Accordingly, the Appellees will address the fourth factor in connection with the first factor.

22

appellant's requested relief in the appeal of a confirmation order might undermine or unravel the plan. See Nordhoff, 258 F.3d at 185-86. Thus, courts typically analyze the following four factors to determine whether the relief requested by the appellant, if granted, would undermine or unravel the plan: (i) the complexity of the plan; (ii) the process through which the plan was formulated and implemented; (iii) the nature and extent of the transactions consummated pursuant to the plan; and (iv) the extent that third-parties have relied on the confirmed plan. See Nordhoff, 258 F.3d at 186 (finding substantial consummation factor satisfied because plan "required eighteen months of negotiation between several parties regarding hundreds of millions of dollars, restructured the debt, assets and management of a major corporation and successfully rejuvenated [the debtor]."). Moreover, courts carefully avoid reopening consummated chapter 11 plans where, as here, it would be "difficult, time-consuming, and inequitable to unravel a plan of reorganization and impose a new reorganization plan on the parties,"[14] where the

---

[14]Spansion, 2011 WL 3420441, at *9; see also Nordhoff, 258 F.3d at 186 (the plan could not be reversed without "great difficulty and inequity"); Ad Hoc Comm. of Class 7 Creditors v. Northwestern Corp. (In re Northwestern Corp.), No. 08-513, 2009 WL 2399120, at *2 (D. Del. Aug. 4, 2009) (dismissing appeal of global settlement because relief could not be granted "without causing adverse consequences to numerous parties, including general unsecured creditors not before the Court"); Schroeder v. New Century Liquidating Trust (In re New Century TRS Holdings, Inc.), 407 B.R. 576, 587-88 (D. Del. 2009) (unraveling of a plan can be "difficult and inequitable" and a "significant fact weighing in favor of finding the appeal equitably moot").

23

relief requested would compel rewriting a plan[15] or where reversal would force a successfully-reorganized company back into bankruptcy.[16]

On the record before this Court, it is clear that granting the relief requested by the Appellants would undermine the consummated Plan, and that each of the corollary legal principles above applies to this case. First, the Plan was certainly complex. It included a number of financial and other transactions, all of which have been fully consummated. The Plan is not so "simple" that it can be "easily reversed." Nordhoff, 258 F.3d at 186. In Nordhoff, the appellants, a creditor and a committee of equity holders, challenged a reorganization plan, arguing that the bankruptcy court relied on an incorrect valuation of the debtor's assets in

---

[15]See, e.g., Spansion, 2011 WL 3420441, at ** 7-8 (appeal dismissed as equitably moot where, if successful, the relief sought "'would doubtless result in the need to negotiate a new plan'" and "impose a new reorganization plan on Appellees") (quoting Grimes v. Genesis Health Ventures, Inc. (In re Genesis Health Ventures, Inc.), 280 B.R. 339, 346 (D. Del. 2002)); Campania Int'l Financiera S.A. v. Calpine Corp. (In re Calpine Corp.), 390 B.R. 508, 521 (S.D.N.Y. 2008), aff'd, 354 F. App'x 479, 2009 WL 4066937 (2d Cir. 2009) (impractical to force settling parties to renegotiate a new plan of reorganization through a new bankruptcy process); ACC Bondholder Group v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.), 367 B.R. 84, 96-97 (S.D.N.Y. 2007) (rewriting the terms of the bargain would "knock the props" out from under the plan and is beyond the power of the court).

[16]See, e.g., Zenith, 329 F.3d at 344 (probability of reentering bankruptcy weighs in favor of equitable mootness); Continental, 91 F.3d at 561 (equitable mootness warranted where "reversal of the order confirming the Plan likely would put Continental back into bankruptcy"); see also Calpine, 390 B.R. at 521 (continuation appeal dismissed where the reorganized debtor would "be forced to reenter bankruptcy").

24

approving the reorganization plan. Id. at 184. The debtor moved to dismiss the appeal on the basis of equitable mootness. Id. The major features of the reorganization plan included: "1) exchanging approximately $103 million in bonds bearing interest at 6.25 percent for $50 million in new bonds bearing interest at 8.19 percent; 2) canceling [the debtor's] stock for no consideration; 3) issuing new [ ] stock ... in exchange for $200 million of debt relief forgiving debt owed to [the creditor]; 4) extending a new $60 million credit facility to [the debtor]; 5) canceling approximately $175 million in additional debt owed to [the creditor] in exchange for $135 million of new debt and ownership of [the debtor's] television plant in Reynosa, Mexico; 6) refinancing of debt owed to a consortium of banks ...; 7) no alteration of debt owed to trade creditors; and 8) releasing [the creditor], [the debtor's] directors and officers, and [a] Bondholder's Committee from potential liability to [the debtor] or certain creditors." Id. at 182. The Appellees' Plan contains most of the transactions highlighted as complex in Nordhoff. It would be impossible to unwind those transactions.

Second, the Plan is a holistic agreement that incorporates several interrelated, underlying agreements among the Appellees, the Plan Sponsor Group, the Backstop Funder and the Committee, each of which was negotiated and accepted by these sophisticated parties and forms an integral component of the Plan. Any attempt to unwind the Confirmation Order and force the undoing of

25

several significant transactions would undermine the foundation of the consummated Plan.[17]  If the Confirmation Order were vacated, the Plan Sponsor Group and Backstop Funder will in all likelihood withdraw from the process as they indicated they would previously.  See, e.g., Opinion on Confirmation, p. 31 ("[i]t is undisputed that absent these contributions and waivers, a Plan cannot be confirmed and that absent the requested releases, the funds will not be provided); Confirmation Hr'g Tr. 177:25-178:3 (Feb. 19, 2014) ("[a]nd finally, which I think is the obvious thing, to get Care One and Care Realty and Health Bridge to provide the consideration, in my case it's the waiver of claims, there needs to be litigation peace.").  Without the Plan Sponsor Group and Backstop Funder, the reorganization will fail, resulting, as the Bankruptcy Court observed in its Opinion on Confirmation, in the loss of hundreds of jobs.  See Opinion on Confirmation, p. 34 ("[w]ithout the waivers, Plan confirmation is impossible and the Facilities would be closed, liquidated, and 1,100 jobs lost, including 700 Union Employees").  Quite simply, as was the case in Asman, without the Plan Sponsor

---

[17]See R2 Invs., LDC v. Charter Commc'ns, Inc. (In re Charter Commc'ns, Inc.), 691 F.3d 476, 484-86 (2d Cir. 2012) (effort to modify settlement was "no ministerial task" and could potentially cause settling parties to withdraw support for the Plan and require parties to reenter negotiations, and ultimately threaten the debtors' successful emergence).  The "delicate balance" achieved by the highly-negotiated settlements in the Plan would disintegrate if the Court pressed the reset button, reopened negotiations and revisited the belabored plan process in this case. Genesis Health, 280 B.R. at 346 (dismissing appeal because appellant's relief "would likely topple the delicate balance and compromises struck by the Plan").

26

Group and significant contributions therefrom, the Appellees would, in all likelihood, be "forced to close [its] doors." Compare Asman, 2006 WL 2990366, *3, with Opinion on Confirmation, p. 44 ("[i]n reality, Plan failure dictates Debtors will cease operations, close the Facilities, and liquidate"). Similarly, if the 1113(c) Order is reversed, the Plan will fail. As the record reflects, without the modifications of the uneconomic conditions of the expired collective bargaining agreements pursuant to 1113(c) Order, the Appellants cannot operate and must close. Entry of the 1113(c) Order was, and continues to be, a condition for confirmation and continued viability of the Appellees. Likewise, reversal of the Claims Objection Order would cause the Plan to fail. The Bankruptcy Court noted that the Appellees did not have funds to reserve for the contingent portion of the Backpay Claim the Appellants claimed was entitled to priority treatment. Reversal of the Claims Objection Order will make the Plan unfeasible.[18]

Third, the nature and extent of the transactions consummated pursuant to the Plan represent the culmination of a lengthy process of negotiation and litigation that lasted 13 months and cost millions of dollars. See Nordhoff, 258 F.3d at 186 (finding substantial consummation factor satisfied because plan "required eighteen months of negotiation between several parties regarding hundreds of millions of

---

[18]As discuss in Section II below, one of the NLRB's objections to confirmation was that the failure to reserve for this contingent claim, which they estimated at over $9 million, rendered the Plan unfeasible.

dollars, restructured the debt, assets and management of a major corporation and successfully rejuvenated [the debtor].").  Courts have found that the sorts of transactions undertaken here in furtherance of the Plan demonstrate substantial consummation that cannot be unwound.  For example:

> (i)     Appellees entered into the exit facility and satisfied their debtor-in-possession revolving credit facility.  See Nordhoff, 258 F.3d at 184 (plan replaced debtor-in-possession facility with new $150 million facility); In re Old Bridge Chems., Inc., 2006 WL 2990366, *2 (D.N.J. Oct. 18, 2006) (debtors refinanced existing credit facility and entered into new credit facility); In re Box Bros. Holding Co., 194 B.R. 32, 41 (D. Del. 1996) (debtors entered into new $4.5 million secured credit facility); In re SLI, Inc., 2004 WL 2346021, *2 (D. Del. Oct. 5, 2004) (plan included $20 million term loan facility); In re Innovative Clinical Solutions, Ltd., 302 B.R. 136, 141-142 (Bankr. D. Del. 2003) (plan included $10 million credit facility); In re Dura Auto. Sys., Inc., 403 B.R. 300, 305-307 (D. Del. 2009) (reorganized debtors entered into new $110 million credit facility).

> (ii)    Appellees' old membership interests have been cancelled and the New Membership Interests assigned to Care Realty, LLC.  See Nordhoff, 258 F.3d at 184 (plan cancelled old stock); SLI, Inc., 2004 WL 2346021 at *2 (plan cancelled and delisted old stock); Dura, 403 B.R. at 305-307 (except as otherwise provided in the plan, old stock and notes were cancelled).

> (iii)   Appellees distributed millions of dollars in cash to holders of priority, administrative expense, professional compensation and Class 5 claims.  See In re Polaroid Corp., 2004 WL 2223301, *2-3 (D. Del. 2004) (all administrative and priority claims were paid and distributions to unsecured creditors had begun); Old

> Bridge Chems., Inc., 2006 WL 2990366 at *2 (payments
> had been made to more than 250 creditors); Dura, 403
> B.R. at 305-307 (distributions to creditors had
> commenced, but had not been completed).

Fourth, granting the relief requested by the Appellants would also be difficult, impractical and inequitable to the Appellees' creditors, employees, patients and other stakeholders who have relied on the Plan. None of those individuals or creditors (other than the Appellants) are before this Court. Any effort to disgorge Plan distributions would, at best, be extremely difficult and could violate precepts of due process and test the outer limits of this Court's jurisdiction. As set forth in the Marcos Declaration, given the many transactions consummated in reliance on the confirmed Plan, it is difficult to conceive of a way to unwind the transactions and return the Appellees and its creditors to their pre-emergence positions. Thus, there is substantial evidence before this Court that the Plan has been substantially consummated and that granting the appeal would unravel the Plan, upon which numerous parties relied.

It is the existence of that substantial evidence that differentiates the present case from the Third Circuit's decision in Semcrude, 728 F.3d at 321. In Semcrude, the Third Circuit reversed the District Court's dismissal of the appeals on equitable mootness grounds because the record did not support the District Court's findings that granting relief to appellants would undermine the plan and harm third-parties. See 728 F.3d at 323. Indeed, the Third Circuit found the District Court's

29

conclusions were unsupported by evidence and, instead, found the District Court relied on the debtor's "chicken little" statements. See id. at 323-24.

For example, the Third Circuit found it significant that the appellants in Semcrude were seeking a ruling that the plan did not discharge their claims and that they may assert those claims in an adversary proceeding. See id. at 323. The appellants did not seek to unwind the $160 million settlement among the debtors and the oil and gas producers that paved the way for the debtor's emergence pursuant to a plan of reorganization that incorporated, and was premised on, the $160 million settlement. See id. at 319, 323-24. A ruling on whether the plan discharged their claims would not upset the settlement or the cause the plan to collapse. See id. at 324. Indeed, the appellants claimed they were entitled to an additional $207,300.62 in allowed claims (for a total allowed claim of $417,746.45), which was less than 0.13% of the $160 million settlement designated for distribution to the producers and paled in comparison to the entire reorganization plan, which involved over $2 billion. See id.

In contrast, here, the Appellants challenge the very essence of the Confirmation Order and the transactions contemplated by the Plan. Namely, the Appellants appeal threshold issues such as whether the Bankruptcy Court had subject-matter jurisdiction and the statutory authority under 28 U.S.C. § 157(b)(1) to grant non-debtor entities a nonconsensual third-party release and injunction

30

releasing them from causes of action and claims brought by the National Labor Relations Board. The Appellants also challenge the permissibility of nonconsensual third-party releases in light of 11 U.S.C. § 524(e) and whether such releases satisfy the minimum standards of fairness, necessity, and supporting evidence required for any such releases to be granted. The Appellants further challenge the best interests of creditors test under 11 U.S.C. § 1129(a)(7), and whether, on the facts presented, did the Bankruptcy Court err in granting confirmation when the plan purportedly unfairly discriminates against the NLRB's claims without a legitimate basis for such discrimination. Further, the Appellants challenge the feasibility of the Plan. Moreover, the Appellants appeal the transfer of equity interests in the reorganized debtors to Care Realty LLC. Lastly, the Appellants challenge the good faith of the Plan.

These challenges are not related to tertiary issues that impact "roughly one-hundredth of one percent" of the dollars at issue in the reorganization. Compare Semcrude, 728 F.3d at 324; Zenith, 329 F.3d at 343–44 (appeal not equitably moot where disgorgement of professional fees would not unravel plan); United Artists Theatre Co. v. Walton, 315 F.3d 217, 228 (3d Cir. 2003) (appeal not equitably moot where striking indemnification provision would allow the plan to stay otherwise intact). Rather, these are eight (8) specific challenges to the very core of the Confirmation Order where if one, let alone all eight (8), is decided in favor of

the Appellants, the consummated Plan would fail.  In <u>Semcrude</u>, the "perceived harms [were] at best speculative."  728 F.3d at 325.  On the contrary, here, the harms are factually supported, genuine and, imminent, to the extent this Court grants the Appellants' requested relief.  For these reasons, the facts of this case are the antithesis of those in <u>Semcrude</u> and clearly require dismissal of the Appeals as equitably moot.

### 2.    The Appellants Failed To Obtain A Stay

Under the second <u>Continental</u> factor, the failure to obtain a stay weighs in favor of equitable mootness.  "The existence or absence of a stay is a critical factor in determining whether to dismiss any appeal under the doctrine of equitable mootness."  <u>In re Grand Union Co.</u>, 200 B.R. 101, 105 (D. Del. 1996).  Because of the nature of plan confirmation, the Third Circuit has held that it "is obligatory upon appellant . . . to pursue with diligence all available remedies to obtain a stay of execution of the objectionable order (even to the extent of applying to the Circuit Justice for relief . . .), if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from."  <u>Nordhoff</u>, 258 F.3d at 186-187 (quoting <u>In re Highway Truck Drivers & Helpers Local Union # 107</u>, 888 F.2d 293, 297 (3d Cir. 1989)).  Even when a stay is sought, but not obtained, as here, this factor weighs in favor of equitable mootness.  <u>See</u> <u>Continental</u>, 91 F.3d at 562

32

("A stay not sought, and a stay sought and denied, lead equally to the implementation of the plan of reorganization.").

Appellants acknowledged their Appeals could become equitably moot if they failed to obtain a stay of the Confirmation Order.  See Motion For Stay of Confirmation Order, Civil Action No. 14-cv-01542 (CCC), Docket No. 5, pp. 26-27.  However, after unsuccessfully seeking a stay from both the Bankruptcy Court and this Court, the NLRB never sought a stay from the Third Circuit. Further, during that time, events, transactions and occurrences have transpired that would make any potential relief increasingly impossible and inequitable.  Thus, this factor weighs heavily in favor of dismissal.

### 3. The Relief Requested By The Appellants Would Adversely Affect The Rights Of Creditors And Other Third Parties Not Before The Court

The third Continental factor evaluates whether granting the relief requested would "adversely affect parties not before the court."  Phila. Newspapers, 690 F.3d at 169.  One of the underlying purposes of the equitable mootness doctrine is to protect third parties who relied on and acted upon the implemented plan.[19]  See id.; Dura, 403 B.R. at 307 (citing Continental, 91 F.3d at 562).  Protecting these

_____

[19]Critically, when evaluating this factor, it is irrelevant whether the third-party reliance was "reasonable under the circumstances" or whether "either party had some probability of success on appeal."  Continental, 91 F.3d at 565.  Rather, the issue is whether the court should dismiss the appeals because the relief requested would adversely affect parties who relied on the confirmed plan.  Id.

33

parties' interests is "[h]igh on the list of prudential considerations." Nordhoff, 258 F.3d at 188 (quoting Continental, 91 F.3d at 562).

Here, the relief Appellants seek cannot be granted without significantly and irreparably infringing the rights of third parties. Appellants seek nothing short of a "do over" and unwinding of the Plan. If that were to occur, it would put in limbo all of the distributions that have been made under the Plan, the effectiveness of the exit facility, all borrowings under Appellees' new exit facility and the continued validity of numerous other transfers and transactions. Countless third parties have relied on these transfers and transactions, and there is simply no way that they could be put back into the positions that they were in as of the Effective Date.

As evidenced by the Marcos Declaration, granting the relief requested by the Appellants would be unfair and disruptive to numerous third parties not before this Court, even assuming that such relief would be possible in the first instance.[20] In particular, reversal of the Confirmation Order would substantially harm the following third parties who relied on the Confirmation Order and the unstayed Plan:[21]

---

[20]See, e.g., In re Blumer, 66 B.R. 109, 113 (B.A.P. 9th Cir. 1986) ("effective relief is impossible if funds have been disbursed to persons who are not parties to the appeal"), aff'd, 826 F.2d 1069 (9th Cir. 1987).

[21]The Appellees understand that Care Realty, LLC, Care One, LLC and Healthbridge Management, LLC intend to file a motion to intervene in these Appeals under Fed. R. Civ. P. 24. If intervention is granted, the relief Appellants

34

- *Employees*:  Unwinding the Plan would create considerable uncertainty for hundreds of employees.  Reversing the Confirmation Order will cause the five (5) facilities to close and hundreds of employees will be terminated.  Marcos Declaration, ¶¶ 27-31.

- *Patients*:  Reversing the Confirmation Order and undermining the Plan will force sick and frail elderly patients to relocate.  The Appellees cannot emphasize enough the stress that will be placed on their elderly patients if the Plan is unwound and the Appellees are forced to close their facilities.  That stress was not lost on the Bankruptcy Court and should not be lost on this Court.  <u>See</u> Opinion on Confirmation, p. 9 ("[i]n the event of closure, elderly patients would have to be relocated to other care facilities, which could easily take several weeks"); Opinion on Confirmation, p. 44 ("[i]n reality, Plan failure dictates Debtors will cease operations, close the Facilities, and liquidate. The elderly will be relocated and suffer the stress related to such physical move. Clearly, their health will be compromised").

- *Vendors and Contract Counterparties*:  Even putting aside the disastrous impact of vacating the Confirmation Order, the Appellees have completed, entered into, or effectuated numerous business transactions and activities in the ordinary course and in reliance upon the effectiveness of the confirmed Plan.  Marcos Declaration, ¶ 30.  The parties to these transactions would be severely harmed if the transactions were unwound in a new bankruptcy proceeding.[22]

- *General Unsecured Creditors:*  Creditors have received the first three (3) monthly distributions and been able to transact business with the Appellees outside the uncertainty of the bankruptcy case.  Marcos Declaration, ¶¶ 10, 19.  Many of the trade creditors, <u>i.e.</u>, the Ongoing Trade Vendors, have provided the Appellees with the Extended Terms and Credit, in accordance with the Plan (which increases each Ongoing Trade Vendor's risk of nonpayment).  None of those creditors (other than

---

seek, if granted, would materially infringe on the rights of these parties, but such parties would be represented by counsel before this Court.

[22]<u>See</u>, <u>e.g.</u>, <u>Calpine</u>, 390 B.R. at 521 ("requiring a new confirmation process may result in ... the creation of a crisis of confidence for shareholders, creditors, customers, vendors and employees").

35

the Appellants) is a party to the Appeals, yet all would be subject to disgorgement of their distributions in the event of reversal of the Confirmation Order. Moreover, shutting the doors – the likely result of vacating the Confirmation Order – will result in no further distributions under the Plan, as the liquidation analysis approved by the Court demonstrates that creditors would receive nothing upon a liquidation. Further, vacating the Confirmation Order is a "Termination Event" under the Backstop Funding Agreement and Care Realty, LLC would no longer be obligated to back-stop payments on account of Class 5 Allowed Claims. Unsecured creditors, supported by the Committee overwhelmingly supported the Plan and the Appellees' emergence from Chapter 11. Putting the case back into bankruptcy inequitably alters the rights of these innocent parties not before this Court on the Appeals.

- *Care Realty, LLC*:  Upon confirmation of the Plan, and the expiration of all applicable stays, each Appellee issued and delivered to Care Realty, LLC the New Membership Interests. Marcos Declaration, ¶ 14. The Appellees received approval from the Connecticut Department of Health and from HUD with respect to Care Realty, LLC owning the New Membership Interests in the Reorganized Debtors effective as of the Effective Date. Id., ¶ 14. Since that time, the Appellees have operated their businesses as reorganized debtors and Care Realty, LLC has assumed business oversight responsibilities of the Appellees. In addition, Care Realty, LLC waived its $31 million general unsecured claim. Care Realty, LLC also executed and bound itself to the Backstop Funding Agreement. In March 2014, Care Realty, LLC contributed $575,000 to cover operating shortfalls. Marcos Declaration, ¶ 26. In April 2014, Care Realty, LLC contributed $653,000 to cover operating shortfalls. Id. The Appellees project that in May 2014, Care Realty, LLC will be required to contribute approximately $200,000 to cover operating shortfalls. Id. Unwinding confirmation, upon which Care Realty, LLC expressly relied, will undermine its expectations for this transaction.

- *Care One, LLC*:  Upon confirmation of the Plan, Care One, LLC funded the $500,000 on account of the Plan Distribution Contribution Amount. Marcos Declaration, ¶ 11.

- *Affiliated Landlords*:  Under the Plan, the Affiliated Landlords waived $1.1 million in administrative expense claims for rent during March through November 2013. In addition, the Affiliated Landlords waived

36

$13.6 million in obligations which would have been payable to cure arrearages on leasehold obligations in order to assume the leases at the facilities in which the Appellees operate. Marcos Declaration, ¶ 16.

- *Healthbridge Management LLC*: Under the Plan, Healthbridge Management, LLC waived $2.6 million in administrative expense claims for management fees during March through November 2013. Marcos Declaration, ¶ 16.

- *Care Group L.L.C.*: Entered into new management agreements with the Appellees in reliance on the Confirmation Order and conclusion of the Chapter 11 cases. Marcos Declaration, ¶ 25.

Thus, Appellees' lenders, employees, vendors, patients, the Plan Sponsor Group, the BackStop Funder and any creditors that released liens or otherwise irreparably altered their position in reliance on the Confirmation Order would be adversely affected by the relief requested by Appellants.

When it appears to a court that it would be nearly impossible to restore the estate or its claimants to *status quo* as it existed prior to the confirmation order, a finding of equitable mootness is appropriate. See, e.g., In re Manges, 29 F.3d 1034, 1043 (5th Cir. 1994) (appeal dismissed on equitable mootness where "we doubt seriously that we could place the estate or the parties back into the status quo as it existed before the confirmation order if we were to unravel the plan at this time"). As the Ninth Circuit concluded in In re Roberts Farms, Inc., reversing the Confirmation Order would create an "unmanageable, uncontrollable situation":

> Certainly, reversal of the order confirming the plan of arrangement, which would knock the props out from under the authorization for every transaction that has

37

> taken place, would do nothing other than create an
> unmanageable, uncontrollable situation for the
> Bankruptcy Court.

In re Roberts Farms, Inc., 652 F.2d 793, 797 (9th Cir. 1981).

Confronted with similar circumstances as exist here, the Fifth Circuit Court

of Appeals held as follows:

> [A]s noted above, millions of dollars in administrative
> and priority claims have been paid to claimants not
> parties to this appeal. …
>
> We must evaluate these transfers, many of which appear
> irreversible, against the backdrop of the relief sought –
> nothing less than a wholesale annihilation of the Plan.
> All of these third-party recipients and many others have
> relied upon the Plan, and the irretrievable depletion of
> estate assets would correspondingly decrease the
> amounts available to all claimants.  In short, we doubt
> seriously that we could place the estate or the parties
> back into the *status quo* as it existed before the
> confirmation order if we were to unravel the Plan at this
> time.  Therefore, we conclude that this factor weighs
> heavily against our interference at this late date.

Manges, 29 F.3d at 1043.

Several courts, faced with analogous facts, have dismissed appeals that, if

successful, would have materially harmed creditors, investors, employees,

customers, vendors and other stakeholders with an economic stake in the

reorganization.[23]  Because granting the relief requested by the Appellants similarly

---

[23]See, e.g., Nordhoff, 258 F.3d at 189 (dismissed appeal to protect parties
not before the reviewing court); Spansion, 2011 WL 3420441, at ** 12-13
(dismissed appeal to protect shareholders, vendors, customers, and other third

would prejudice the "creditors [and other third parties who] undoubtedly entered into countless transactions with their distributions," see Adelphia, 367 B.R. at 96, the third Continental factor is satisfied here.

Again, it is the existence of irrefutable evidence that granting relief to the Appellants would harm third-parties that distinguishes this case from Semcrude, 728 F.3d at 325. In Semcrude, the debtors indentified four groups they claimed would be adversely affected: (1) lenders; (2) equity investors; (3) customers and suppliers; and (4) creditor constituencies. 728 F.3d at 325.

The debtors first argued the exit lenders would *likely* terminate the exit facility if the Confirmation Order is overturned. Semcrude, 728 F.3d at 325. The Third Circuit found there was no evidence supporting that inference. Id. The affidavit submitted in support of dismissal "says nothing about whether the lenders would seek to invalidate the loan agreements if Appellants are granted relief, let alone that they would have the legal right to do so." Id.

In contrast, here, as set forth in the Grate Declaration, the Credit Agreement dated March 7, 2014 (the "**Credit Agreement**") with Capital One, N.A., as exit

---

parties); Dura, 403 B.R. at 307 (dismissed appeal that "adversely affect[ed]" exit funding lenders, stockholders, customers and suppliers); High River Ltd. P'ship v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.), No. 01-226, 2002 WL 500569, at *2 (D. Del. Mar. 26, 2002) (dismissed appeals that "affect[ed] all third parties with an economic stake in the sale," including employees and consumers).

lender (the "**Exit Lender**"), specifically provides that an event of default exists if the Appellees fail to comply with or fully consummate the Plan, or the Plan or Confirmation Order is revoked. See Grate Declaration, Ex. A., Credit Agreement, § 9.1(y). If an event of default occurs, the Exit Lender is legally permitted to terminate the commitment to make the revolving loan available. See id., § 9.2(a). As set forth in the Grate Declaration, if an event of default occurs under Section 9.1(y), the Exit Lender will be entitled, pursuant to Section 9.2(a) of the Credit Agreement, to exercise any and all rights and remedies available under the Credit Agreement and other Loan Documents, applicable law (including, without limitation, the Uniform Commercial Code) or otherwise, including, but not limited to, terminating its commitment to make loans to the Appellees. As further set forth in the Grate Declaration, a reversal of the Confirmation Order could adversely impact the Appellee's ability to continue to operate. For this reason, it is specifically listed as an Event of Default in the Credit Agreement, which upon occurrence would automatically result in the Exit Lender's right to terminate the exit credit facility.

In addition, in Semcrude, the Third Circuit was also not persuaded that the equity investors would be materially harmed. See Semcrude, 728 F.3d at 325. The Third Circuit found the oil and gas producer's claims to be relatively insignificant, the financial well-being of the reorganized debtors (and, thus, the prospects of their

equity investors) would not be threatened by granting appellants the relief they

requested, the reorganized debtors had a variety of credit sources available to fund

their operations, and the Court was not provided any testimony or other evidence

to the contrary. See id. at 326-27. Further, the Third Circuit noted that since

emergence, the financial health of Semcrude had robustly improved. See id. at

326.

Quite the opposite here. The equity investor, Care Realty, LLC, has

contributed substantial sums of money and waived significant claims in exchange

for the equity in the Appellees. If the Confirmation Order is reversed, those

contributions and accommodations would be for naught. The equity interests

would become valueless since the Appellees would have to close. Further, the

Appeals do not concern a tertiary issue - - such as a determination as to whether

insignificant claims were discharged under the plan like in Semcrude. Rather,

Appellants have challenged practically every single aspect of the Confirmation

Order which, if successful, will unwind a year of litigation, millions of dollars of

expenses and threaten the financial health of the facilities. Similarly, the

challenges to the 1113 Orders and the Claims Objection Order, if successful,

would destroy any hope of reorganization. See Section II, infra. Further, the

Appellees have not emerged from bankruptcy in robust financial health like in

Semcrude. In March 2014, Care Realty, LLC contributed $575,000 to cover

41

operating shortfalls.  In April 2014, Care Realty, LLC contributed $653,000 to cover operating shortfalls.  The Appellees project that in May 2014, Care Realty, LLC will be required to contribute approximately $200,000 to cover operating shortfalls.  Unwinding confirmation, upon which Care Realty, LLC expressly relied, will undermine its expectations for this transaction and materially harm its equity interests in the Appellees.

Lastly, the Semcrude court was not convinced granting relief to appellants in that case would cause harm to customers/suppliers and/or creditors.  See Semcrude, 728 F.3d at 326.  Specifically, a determination as to whether the oil and gas producer's claims were discharged under the plan has no impact on the executory contracts and unexpired leases assumed under the plan.  See id.  Further, granting relief to the appellants would not undermine any settlements achieved under the plan - - namely, the $160 million producer settlement.

Quite the reverse, here, as unwinding the Plan would create considerable uncertainty for hundreds of employees, patients, vendors and contract counterparties as the only result that would come from reversal of the Confirmation Order would be an immediate closure of the facilities.  Moreover, creditors have received the first of three (3) monthly distributions and been able to transact business with the Appellees as reorganized debtors operating as a going concern.  Shutting the doors – the likely result of vacating the Confirmation Order

42

– will result in no further distributions under the Plan, as the liquidation analysis approved by the Court demonstrates that creditors would receive nothing upon a liquidation.  Further, vacating the Confirmation Order is a "Termination Event" under the Backstop Funding Agreement and Care Realty, LLC would no longer be obligated to back-stop payments on account of Class 5 Allowed Claims.  Because the Appellees would have to close down and liquidate, these creditors may not be paid for goods and services provided post-confirmation in reliance on the Plan.  Putting the case back into bankruptcy inequitably alters the rights of these innocent parties not before this Court on the Appeals.

For these reasons, Semcrude should not guide this Court because Semcrude was decided on very different facts.  Here, the evidentiary record supports the Appellees' contentions that the relief requested by Appellants would adversely affect parties not before this Court.

### 4. The Relief Requested By The Appellants Would Threaten The Success Of The Plan

Under the fourth Continental factor, an appeal should be dismissed as equitably moot if the relief requested would affect the success of the plan.  See Continental, 91 F.3d at 560.  This factor examines whether the requested relief would, as a practical matter, undermine or unravel the plan.  Phila. Newspapers, 690 F.3d at 169 (citing Nordhoff, 258 F.3d at 189).  Specifically, courts consider whether the appellant's concerns could be remedied "without unraveling the

43

entirety of the plan or whether [the appellant] seek[s] to knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court." Nordhoff, 258 F.3d at 189 (internal citations and quotations omitted). "A plan's success is detrimentally affected where granting appellant's requested relief effectively imposes a different plan of reorganization on the parties." Dura, 403 B.R. at 307 (internal citations and quotations omitted).[24]

Because this factor is substantially similar to the question addressed, supra, in Section A(2) of this brief, i.e., whether the relief requested would undermine the consummated Plan, all of the evidence and other reasons summarized in that Section equally satisfy this factor. In short, reversal of the Confirmation Order would "knock the props out from under" the Plan. See Nordhoff, 258 F.3d at 189 (internal citations and quotations omitted). All of the issues on appeal go directly to threshold requirements for confirmation. Therefore, it is not possible to craft an intermediate remedy that would not annihilate the Plan and put its continued viability in jeopardy. Thus, the relief requested by Appellants would disrupt substantially the success of the Plan.

---

[24]In this case, the "different plan of reorganization" would be a plan of liquidation in which the facilities are closed, the frail and elderly patients are forced to relocate and the unsecured creditors, including those who have extended credit to the Appellees post-confirmation, get nothing.

44

### 5. Finality In This Chapter 11 Reorganization Best Serves Public Policy And Supports Equitable Mootness

The strong and well-established public policy of encouraging reliance on confirmed plans, finality of bankruptcy judgments, and the successful reorganization of a company, strongly favors dismissal of the Appeals. This final Continental factor is "the lens through which the other equitable mootness factors should be viewed." Nordhoff, 258 F.3d at 190. Public policy encourages finality and reliance on bankruptcy confirmation orders and is the "central animating force behind the equitable mootness doctrine." Continental, 91 F.3d at 561 ("finality of bankruptcy reorganizations is particularly compelling"); Phila. Newspapers, 690 F.3d at 169 (encouraging reliance on confirmation orders "facilitat[es] successful reorganizations"); Genesis Health, 280 B.R. at 347 ("When investors and other third parties can rely on a confirmed plan[] … they have the footing and confidence they need to pursue investments and business arrangements with the reorganized debtor, all of which foster the debtor's successful reorganization.").

The policy favoring the finality of confirmation orders is particularly pertinent here where (i) numerous parties have acted in reliance on the Confirmation Order (and there is no way to restore them to their positions as of the Effective Date), (ii) the Plan was the product of lengthy negotiations and litigation and lengthy confirmation hearings, and (iii) unwinding the Plan would put

Appellees, other interested parties and the Bankruptcy Court in an untenable position leading to chaos, litigation and escalating costs.

In short, the Appellants' continued efforts to dismantle the Plan would undermine "public confidence" in the consummation of this reorganization. Continental, 91 F.3d at 565 (remedy would "make successful completion of large reorganizations like this more difficult"). This Court should therefore leave the consummated Plan undisturbed. Accordingly, this factor weighs heavily in favor of dismissing the Appeals of the Confirmation Order.

### B. THIS COURT SHOULD EXTEND THE DOCTRINE OF EQUITABLE MOOTNESS TO DISMISS THE APPEALS OF THE 1113 ORDERS AND CLAIMS OBJECTION ORDER

Although the equitable mootness doctrine applies most often to appeals of confirmation orders, courts have extended the doctrine to appeals of other types of bankruptcy court orders, where the subject matter of the order is integral to the plan of reorganization. See In re Ormet Corp., et al., No. 2:04-CV-1151, 2005 WL 2000704, at *6 (S.D. Ohio Aug. 19, 2005); In re HNRC Dissolution Co., No. 04-158 (HRW), 2005 WL 1972592, at **8-9 (E.D. Ky. Aug. 16, 2005); In re Blue Diamond Coal Co., 160 B.R. 574, 575 (E.D. Tenn. 1993).

In Ormet Corp., the United Steelworkers of America (the "**USWA**") and Ormet Corp., the debtor, were parties to two collective bargaining agreements. 2005 WL 2000704, at *1. Ormet filed an application under Section 1113 to reject

46

and modify those agreements, and the bankruptcy court approved the application.
Id. The USWA appealed the bankruptcy court's Section 1113 decision. Id. The
bankruptcy court confirmed a plan of reorganization shortly after it approved the
Section 1113 rejection. Id.

Given a stay was not obtained, the plan had been substantially
consummated, and the relief requested in the appeal would affect the rights of
parties not before the court and the success of the plan, Ormet moved to dismiss
the appeal of the 1113 order as equitably moot. Id. at *4-5. The court noted that
other courts have extended the application of the doctrine of equitably mootness to
beyond confirmation orders to other types of bankruptcy orders, where the subject
matter of the order is "integral" to the plan of reorganization. Id. at *6. The court
found that the Section 1113 rejection orders were integral to the confirmed plan of
reorganization. Id. at *7. A condition precedent to confirmation of the plan was
that the debtors either enter into new collective bargaining agreements or obtain
relief under Section 1113. Id. The court further noted that there "was no factual
dispute before the bankruptcy court that, without some modifications to reduce
labor costs by $14.6 million, Ormet would have been forced to liquidate." Id. The
modifications approved by the rejection orders enabled Ormet to achieve the labor
cost savings necessary for it to obtain exit financing and successfully reorganize.

47

Id. Indeed, the "Section 1113 relief was at the core of every financial projection underlying the Plan." Id.

Furthermore, the court found that Ormet demonstrated how reversal of the rejection orders would undermine the plan and threaten the company's viability. Id. at *7. Reversal of the orders would set the Section 1113 modifications aside. Id. Because the "prior collective bargaining agreements expired in July and August of 2004, reversal would, by operation of the National Labor Relations Act, result in the reinstatement of the relevant terms and conditions of the old bargaining agreements until the parties bargained to new agreements or reached impasse." Id. Reinstating the old terms and conditions the court found would eviscerate the labor cost savings realized by the modifications and Ormet could not operate the facilities absent those cost savings. Id. In addition, resuming operations under the old terms of the collective bargaining agreements would eliminate available excess cash flow and cause an immediate event of default under the exit financing documents. Id. Thus, the court concluded that to reverse the rejection orders would "knock the props out" from under the reorganization plan. Id. at *8 (citing Roberts Farms, 652 F.2d at 797). Thus, the court invoked the doctrine of equitable mootness and dismissed the appeals of the 1113 rejection order. Id. at *10.

48

Similarly, in <u>HNRC Dissolution Co.</u>, several unions appealed the bankruptcy court's sale and confirmation orders as well as three 1113/1114 Orders (as defined herein). <u>See</u> 2005 WL 1972592, at *1. After a year of failed negotiations with the unions to eliminate the debtors' obligations to provide lifetime retiree and health benefits to their employees, the debtors determined that a reorganization of their coal mining and marketing business as a going concern was no longer feasible, and decided to sell substantially all of their assets through confirmed Chapter 11 plans. <u>Id.</u> The buyers were not interested in purchasing the assets unless they were transferred free and clear of all obligations under the Coal Industry Retiree Health Benefit Act of 1992 ("**Coal Act**") and the collective bargaining agreements. <u>Id.</u>

The debtors filed joint plans, which were predicated on a sale of their assets, and moved for orders allowing them to reject their collective bargaining agreements with the unions pursuant to Section 1113 of the Bankruptcy Code, and to modify certain union retiree benefit plans and Coal Act union retiree benefit plans under Section 1114 of the Bankruptcy Code. <u>Id.</u> at *2. On August 6, 1994, the bankruptcy court issued a memorandum opinion and entered three orders granting the Section 1113 and 1114 motions (the "**1113/1114 Orders**"). <u>Id.</u> The Bankruptcy Court specifically found that the Chapter 11 plans could not be confirmed and consummated without the requested relief. <u>Id.</u> The court also

49

approved the sale of the debtor's business through their confirmed plan free and clear of any obligations to pay retiree benefits. Id.

The Unions appealed and moved for a stay of the sale and confirmation orders. Id. at *3. The court was unwilling to stay those orders absent the posting of a substantial bond, which the Union refused to do. Id. As a result, the debtors completed the sale and transferred substantially all of their assets free and clear of all claims, encumbrances, and interests, and the plans became effective. Id. The debtors then dissolved in accordance with the confirmation orders and proceeds of the sale were distributed under the plans to creditors and to the liquidating trustee. Id. The appellees then moved to dismiss the appeals as statutorily moot under Section 363(m) and under the doctrine of equitable mootness. Id.

Given that the unions did not obtain a stay, the plans had been substantially consummated, and the relief requested by the parties would affect the rights of parties not before the court, the court concluded that modification of the confirmation orders is "both impossible and undesirable." Id. at *10. The unions argued that irrespective of the court's decision as to the confirmation orders, the court could still provide relief that would not upset the reliance interests of third parties should they prevail in their appeal of the 1113/1114 Orders. Id. The court disagreed, finding that it was not possible to grant any relief to the unions in their appeals of the 1113/1114 Orders, without prejudicing third parties and requiring a

50

redistribution of proceeds. Id. Further, the court concluded that the bankruptcy court's findings that the plans could not be confirmed or consummated absent the relief sought through the 1113/1114 Orders was supported by substantial evidence of record. Id. The Unions produced no evidence to the contrary. Id.

The court concluded that the 1113/1114 Orders were fundamental to the plans because the plans could not be confirmed but for those orders. Id. at 12. Because the 1113/1114 Orders were "integral to the plan's formulation and acceptance, they cannot be severed for separate consideration from the entire plan." Id. The court, therefore, concluded that the Section 1113 and 1114 appeals constituted an improper request for piecemeal modification of the substantially consummated plans, which was neither possible nor desirable. Id. at *11. For that reason, the court found that the union's appeals from the entry of the confirmation orders and the 1113/1114 Orders were equitably moot. Id. at *12.

Likewise, in Blue Diamond, the labor union filed a proof of claim for damages arising out of the debtor's rejection of the collective bargaining agreement. In re Blue Diamond, 160 B.R. at 574-75. The bankruptcy court rejected the Union's claim, holding that Section 1113 allows for the rejection of a collective bargaining agreement and does not provide or authorize a union to assert a claim for damages. Id. at 575. The labor union appealed that decision. Id. Subsequently, the debtor confirmed its plan and moved to dismiss the appeal of the

51

claims objection decision as equitably moot given the debtor had substantially consummated the plan. Id. at 576.

The court dismissed as moot the appeal of the claims objection decision because the plan had been confirmed and substantially consummated. In re Blue Diamond, 160 B.R. at 577. The court noted that the bankruptcy court correctly concluded that if the union was allowed to proceed with its claim and if it was successful, the debtor would not otherwise survive and reorganize. Id. The court was of the opinion that effective relief was no longer available to the union "as a result of the comprehensive changes brought about by confirmation and implementation" of the plan of reorganization. Id. at 576. The court also noted the "chaotic situation that would result" if it remanded the case to the bankruptcy court. Id.

Moreover, this court should find In re U.S. Airways Group, Inc., 369 F.3d 806, 808-809 (4th Cir. 2004) to be authoritative on this issue and analogous to the present facts. In US Airways, a pension plan appealed from an unstayed order of the bankruptcy court terminating the debtor's pension pan (the "**Termination Order**"). Id. While the pension plan's appeal of the Termination Order was pending, the debtor's plan was substantially consummated. Id. at 809. The district court therefore dismissed the appeal of the Termination Order as moot, stating that:

> [W]e cannot see how the requested relief-reversal of the termination order-could be granted without undoing U.S.

52

> Airways' reorganization plan and without adversely
> impacting the interests of third parties who have relied
> upon the consummated confirmation order ... What is
> done cannot now be undone. It is simply too late in the
> day to unwind the intricate series of transactions that has
> occurred in the reorganization process in order to grant
> the requested relief and revive the pension plan.

Id. at 810-11.

The facts and circumstances of these cases are on "all fours" with Ormet Corp., HNRC Dissolution Co., and Blue Diamond Coal Co. Similar to Ormet Corp., here, a condition precedent to confirmation of the Plan was the entry of the 1113(c) Order and the Plan likely could not have been confirmed without the relief in the Claims Objection Order. Indeed, such orders are and continue to be integral to the Plan. In fact, in the Consolidation Order, the Court found that consolidation of the Appeals was appropriate based on the presence of common questions of law and fact. The Orders are intertwined and one Appeal cannot be separated from the other.

For example, with respect to the 1113 Orders, the Bankruptcy Court found the Plan was feasible based upon the multi-year financial projections in support of the 1113(c) motion, which demonstrated that with the collective bargaining agreement modification in place pursuant to Section 1113(c) of the Bankruptcy Code, confirmation is not likely to be followed by liquidation. See Opinion on Confirmation, p. 39. In addition, like Ormet Corp., here:

1.      The unrefuted testimony before the Bankruptcy
Court was that should the permanent modifications be
denied, the Appellees would be forced to shut down the
facilities and all of the Appellees' employees—both
Union and non-union—would lose their jobs.  Compare
2005 WL 2000704, at *7, with Opinion on Confirmation,
p. 9.

2.      The modifications approved by the 1113(c) Order
enabled the Appellees to obtain exit financing and
successfully emerge from Chapter 11.  Compare 2005
WL 2000704, at *7, with Marcos Declaration, ¶ 35.

3.      The reversal of the 1113(c) Orders and the Claims
Objection Order would undermine the Plan and threaten
the Appellees' viability.  See 2005 WL 2000704, at *7.
Reinstating the old terms and conditions of the collective
bargaining agreements in the event of a reversal would
cause the Appellees to suffer significant losses and close
down their facilities.  See Opinion on Confirmation, p. 9
(the record revealed that, as a result of labor costs under
the collective bargaining agreements, the Appellees
suffered significant losses between 2010 and 2012, prior
to their bankruptcy filing).

4.      A reversal of the Orders would be an event of
default under the exit facility.  Compare 2005 WL
2000704, at *8, with Marcos Declaration, ¶ 23.

Furthermore, with respect to the Claims Objection Order, the Appellants

initially argued that the Appellees failed the feasibility test because the Plan

ascribed zero value to the NLRB's asserted administrative and priority claims.  The

Bankruptcy Court addressed this concern in the Claims Objection Order and its

opinion fixing the NLRB's administrative claim to the gap period between the

Petition Date and the entry of the First 1113(e) Order.  See Opinion on

54

Confirmation, p. 38. Like <u>Blue Diamond, supra</u>, at 577, if the Bankruptcy Court concluded that the Appellants were allowed to proceed with their priority and administrative expense claims, the Appellees "would be effectively driven out of business."

Moreover, similar to <u>HNRC Dissolution Co.</u>, and for the reasons set forth in the Marcos Declaration and Section I(A)(1) above, it is not possible to grant any relief to the Appellants in their appeals of the 1113 Orders and/or Claims Objection Order, that would not affect the rights of parties not before this Court and require a redistribution of proceeds. Because the 1113 Orders and/or Claims Objection Order were integral to the Plan's formulation and acceptance, they cannot be severed for separate consideration from the entire plan. Effective relief is no longer available to the Appellants "as a result of the comprehensive changes brought about by confirmation and implementation" of the plan of reorganization. <u>In re Blue Diamond, supra</u>, at 576.

Accordingly, this Court should find it appropriate to invoke the doctrine of equitable mootness and also dismiss the Appeals of the 1113 Orders and/or Claims Objection Order.

## CONCLUSION

For the above-stated reasons, the Appellees respectfully request that the

Court grant the Motion and dismiss the Appeals as equitably moot.

DATE: May 19, 2014

<div style="margin-left:40%;">

**COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.**

BY:  _/s/ Michael D. Sirota_____
    MICHAEL D. SIROTA
    GERALD H. GLINE
    DAVID M. BASS
    RYAN T. JARECK

    _Counsel for Appellees_

</div>