**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Michael D. Sirota, Esq.
Attorneys for 710 Long Ridge Road Operating
Company II, LLC, *et al.*, Reorganized Debtors

| | |
|---|---|
| In re: | UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY |
| 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*, | HONORABLE CLAIRE C. CECCHI CIV. ACTION NOS. 14-CV-01725 (CCC), 14-CV-01726 (CCC), 14-CV-02057 (CCC), 14-CV-02058 (CCC), 14-CV-02353 (CCC) AND 14-CV-02354 (CCC) |
| Reorganized Debtors. | |
| THE NATIONAL LABOR RELATIONS BOARD AND THE NEW ENGLAND HEALTH CARE EMPLOYEES UNION, DISTRICT 1199, SEIU, | **DECLARATION OF VICTOR MATTHEW MARCOS IN SUPPORT OF APPELLEES' MOTION TO DISMISS APPEALS AS EQUITABLY MOOT** |
| Appellants, | |
| v. | |
| 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*, | |
| Appellees. | |

51689/0001-10520526v2

I, VICTOR MATTHEW MARCOS, declare pursuant to 28 U.S.C. § 1746:

1. I am the Vice President of each of 710 Long Ridge Road Operating Company II, LLC d/b/a Long Ridge of Stamford, 240 Church Street Operating Company II, LLC d/b/a Newington Health Care Center, 1 Burr Road Operating Company II, LLC d/b/a Westport Health Care Center, 245 Orange Avenue Operating Company II, LLC d/b/a West River Health Care Center and 107 Osborne Street Operating Company II, LLC d/b/a Danbury Health Care Center (collectively, the "**Appellees**"),[1] which are inpatient skilled nursing facilities all located in the state of Connecticut. I have served in that role since August 1, 2012.

2. I am also the Executive Vice President and Chief Financial Officer of Care Realty, LLC, Care One, LLC and Healthbridge Management, LLC (collectively, the "**Affiliates**"), non-debtor entities that are related to the Appellees. The Affiliates contributed substantial funds and made material accommodations in order for the Appellees to confirm their *First Amended Joint Chapter 11 Plan of Reorganization of 710 Long Ridge Road Operating Company II, LLC, et al.* dated

---

[1] When referencing the Appellees, I am referring to them as reorganized debtors. I may refer to the Appellees as the "**Debtors**" to the extent I am discussing those entities while they were operating as debtors and debtors-in-possession in the Chapter 11 Cases (defined herein).

December 10, 2013 [Bankr. Case No. 13-13653 (DHS), Docket No. 759] (as modified, the "**Plan**").  I have served in that role also since August 1, 2012.

    3.    I am familiar with the Appellees' business and financial affairs and the Appellees' day-to-day operations, and am duly authorized to make this declaration on the Appellees' behalf.  If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein.

    4.    I make this declaration (the "**Declaration**") in support of the Appellees' motion to dismiss (the "**Motion**") the appeals (the "**Appeals**") filed by the National Labor Relations Board (the "**NLRB**") and the New England Health Care Employees Union, District 1199, SEIU (the "**Union**," and together with the NLRB shall be referred to herein collectively as, the "**Appellants**") of the following orders entered by the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**") as equitably moot:

    a.    March 4, 2013 order [Bankr. Case No. 13-13653, Docket No. 66] (the "**First 1113(e) Order**") granting the Appellees relief under Section 1113(e) of title 11 of the United States Code (the "**Bankruptcy Code**");

    b.    April 10, 2013 order [Bankr. Case No. 13-13653, Docket No. 230] (the "**Second 1113(e) Order**") granting the Appellees continued relief under Section 1113(e) of the Bankruptcy Code;

    c.    July 15, 2013 order [Bankr. Case No. 13-13653, Docket No. 424] (the "**Third 1113(e) Order**") granting the Appellees continued relief under Section 1113(e) of the Bankruptcy Code;

3

  d. November 22, 2013 order [Bankr. Case No. 13-13653, Docket No. 706] (the "**Fourth 1113(e) Order**," and together with the First 1113(e) Order, Second 1113(e) Order and Third 1113(e) Order shall be referred to herein collectively as, the "**1113(e) Orders**") granting the Appellees continued relief under Section 1113(e) of the Bankruptcy Code;

  e. February 3, 2014 order [Bankr. Case No. 13-13653, Docket No. 898] (the "**1113(c) Order**," and together with the 1113(e) Orders shall be referred to herein collectively as, the "**1113 Orders**") authorizing the Appellees to reject the continuing economic terms of the expired collective bargaining agreements with the Union pursuant to Section 1113(c) of the Bankruptcy Code;

  f. February 6, 2014 order [Bankr. Case No. 13-13653 (DHS), Docket No. 921] disallowing and reclassifying certain claims filed by the NLRB (the "**Claims Objection Order**"); and

  g. March 6, 2014 order [Bankr. Case No. 13-13653 (DHS), Docket No. 989] (the "**Confirmation Order,**" and together with the 1113 Orders and the Claims Objection Order shall be referred to herein collectively as, the "**Orders**") confirming the Plan.

  5. I have reviewed the Motion and am familiar with the Appeals filed by the Appellants. I have extensive personal knowledge about the Appellees' business and financial affairs, the Appellees' Chapter 11 Cases, the Plan, the financial transactions contemplated by the Plan, the significant and material consideration conferred by the Affiliates to confirm the Plan, and other matters that concern the Appellees' consummation of the Plan and their emergence from Chapter 11.

6. All matters set forth in this Declaration are based on (a) my personal knowledge, (b) my review of relevant documents, including the Plan, (c) my opinion, based on my personal experience and knowledge of the Appellees' business and financial condition, or (d) as to matters involving the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure, my reliance on the advice of the Appellees' bankruptcy counsel.

## FACTUAL BACKGROUND

7. On February 24, 2013 (the "**Petition Date**"), each of the Appellees filed a petition for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**") commencing the above-captioned bankruptcy cases (the "**Chapter 11 Cases**").

8. On February 10, 2014 and February 19, 2014, I attended hearings before the Bankruptcy Court concerning confirmation of the Plan. On March 5, 2014, the Bankruptcy Court issued an Opinion [Bankr. Case No. 13-13653 (DHS), Docket No. 983] confirming the Plan. On March 6, 2014, the Bankruptcy Court entered the Confirmation Order.

9. After more than one year in bankruptcy and facing enormous financial pressure, on March 7, 2014, the Appellees consummated and implemented, or commenced consummating and implementing, the various transactions

contemplated in the Plan, and that date was the Effective Date.[2] On that same day, the Appellees emerged from Chapter 11 pursuant to the Plan and Confirmation Order.

10. On or shortly after the Effective Date, the Appellees made certain distributions under the Plan including:

(a) Approximately $210,000 on account of allowed priority and administrative expense claims.

(b) The first three (3) monthly distributions to sixty-one (61) holders of Allowed Ongoing Trade Vendor Claims in Class 5 totaling approximately $485,000.

(c) Approximately $1,595,000 in payments to professionals pursuant to approved final fee applications.

(d) Approximately $543,000 to counsel for M&T Bank ("**M&T**") and Housing & Healthcare Finance LLC insured by the U.S. Department of Housing and Urban Development Federal Housing Administration ("**HUD**") pursuant to the Appellees' pre-petition financing agreements with M&T and HUD.

11. Moreover, on or shortly before the Effective Date, Care One, LLC advanced the $500,000 Plan Distribution Contribution Amount.

12. In addition, the Appellees have implemented several other Plan and operational transactions in reliance upon the effectiveness of the confirmed Plan. The following transactions, many involving third parties not before this Court,

---

[2] All capitalized terms used but not otherwise defined herein shall have the same meanings ascribed to them in the Plan.

were consummated on or shortly after the Effective Date, all in accordance with and in reliance upon the confirmed Plan.

### A. The Closing on the Restructuring Transactions Pursuant to the Plan

13. By operation of the Plan, on the Effective Date, all of the Appellees' assets, including all claims, rights and causes of action, and any assets acquired by Appellees under or in connection with the Plan, revested in Appellees, as reorganized debtors, free and clear of all claims, liens, charges, other encumbrances and interests, except as specifically set forth in the Plan.

14. Under Section 4.3 of the Plan, on the Effective Date, all of the Debtors' membership interests were terminated and the New Membership Interests, representing one hundred percent of the equity interest in each Appellee, were assigned to Care Realty, LLC as provided under the Backstop Funding Agreement and the Plan. In accordance therewith, on the Effective Date, each of the Appellees executed an Amended and Restated Operating Agreement to reflect that Care Realty, LLC is the holder of the New Membership Interests in the Appellees, as reorganized debtors.

15. In addition, the Appellees applied for and received approval from the Connecticut Department of Health and from HUD with respect to the transfer of the ownership interests in the Reorganized Debtors, which approvals became effective as of the Effective Date.

16. Moreover, shortly after the Effective Date, all of the significant Intercompany Claims were cancelled and removed from the Appellees' books and records. In addition, after the Effective Date, the Affiliated Landlords officially waived their entitlement to approximately $13 million in cure costs associated with the Appellees' assumption of their unexpired non-residential real property leases. Furthermore, under the Plan, Healthbridge Management, LLC waived $2.6 million in administrative expense claims for management fees during March through November 2013.

B. **Execution of Ongoing Trade Vendor Agreements**

17. Under the Plan, Class 5 consists of all Allowed Ongoing Trade Vendor Claims against an Appellee. To qualify for treatment in Class 5, Holders of Claims must supply goods, materials and/or render services to one or more of the Appellees and must meet the following requirements: (i) the Holder is conducting, and will continue to conduct, business with an Appellee; and (ii) such Holder agrees to provide Ongoing Trade Vendor Terms to each Appellee with which it transacted business with prior to the Petition Date from and after the Effective Date for a period of no less than one (1) year. Ongoing Trade Vendor Terms is defined in the Plan to mean:

> Trade terms at least as favorable to the Debtors as those practices and programs (including credit limits, pricing, cash discounts, timing of payments, allowances, rebates, reconciliation, product mix, availability, and other

programs) in place with such vendor in the twelve (12) months prior to the Commencement Date (the "**Pre-Existing Trade Terms**"), which shall include Ongoing Trade Vendor's obligation to provide unsecured trade credit to the Debtors on no worse than the following terms:

(a)   Pre-Existing Trade Terms, plus additional net 30-day terms (the "**Extended Terms**").

(b)   Ongoing Trade Vendor shall apply the greater of (i) a 1% reduction or (ii) such available deduction as existed under Pre-Existing Trade Terms, in the total amount invoiced with respect to each individual invoice, if such individual invoice is paid to Ongoing Trade Vendor on or within the Extended Terms (the "**Credit**").

18.   Pursuant to the Plan, as of the date hereof, the Debtors have executed sixty-one (61) Ongoing Trade Vendor Agreements with the Ongoing Trade Vendors. Each of these third-party Ongoing Trade Vendors has extended the "Extended Terms" and "Credit" to the Appellees in reliance on and pursuant to the Plan. The Extended Terms and Credit is projected to provide a net benefit to the Appellees in the amount of approximately $1.5 million.

19.   In addition, pursuant to the Plan, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Ongoing Trade Vendor Claim, each Holder of an Allowed Ongoing Trade Vendor Claim will be paid in Cash an amount equal to 75% of such Holder's Allowed Ongoing Trade Vendor Claim (i) in twelve (12) equal monthly installments commencing on the Effective Date. Since the Effective Date, the Appellees have issued the first three

(3) monthly distributions to Allowed Ongoing Trade Vendors in Class 5 totaling approximately $485,000.

C. **Borrowings Under Exit Financing**

20. To finance the transactions contemplated by the Plan, Appellees closed on a $5 million secured revolving credit facility (the "**Credit Facility**") on the Effective Date with Capital One, N.A., as exit lender (the "**Exit Lender**"). In connection with the Credit Facility, the Appellees were required to execute, among other things, the credit agreement (the "**Credit Agreement**"), a true copy of which is attached to the Declaration of Akim J. Grate, Senior Vice President of Exit Lender as Exhibit "A," security agreement, revolving note, pledge agreement, intercreditor agreement, several deposit account control agreements, management fee subordination agreement and rent subordination agreement, all dated March 7, 2014.

21. Funds from the Credit Facility were released to Appellees on the Effective Date and used to repay the Appellees' debtor-in-possession credit facility in the amount of $1,737,217.26 and have been advanced thereafter to provide working capital for the Appellees. After the Effective Date, the Appellees have drawn on the Credit Facility on at least four (4) occasions.

22. For example, given the operating shortfalls of $575,000 in March 2014 and $653,000 in April 2014 (as discussed in further detail in Section E

below), and the delay in receiving Medicare/Medicaid reimbursement from the State of Connecticut, the Appellees were forced to draw on the Credit Facility to meet their payroll obligations on March 19, 2014, April 2, 2014 and April 30, 2014. Without the availability under the Credit Facility, the Appellees would not have been able to meet those obligations.

23. Under Section 9.1(y) of the Credit Agreement with the Exit Lender, an event of default exists if the Appellees fail to comply with or fully consummate the Plan, or the Plan or Confirmation Order is revoked. If an event of default occurs, under Section 9.2(a) of the Credit Agreement, the Exit Lender is legally permitted to terminate the commitment to make the Credit Facility available.

**D.    Assumption and Rejection of Executory Contracts and Unexpired Leases**

24. On the Effective Date, Appellees assumed approximately forty-three (43) executory contracts and unexpired leases and rejected hundreds of their other pre-bankruptcy contracts. In addition, as part of the assumption of the executory contracts and unexpired leases, on the Effective Date, the Appellees paid $272,254.28 in cure costs under Section 365(b)(1)(A) of the Bankruptcy Code.

25. In addition, on the Effective Date, the Appellees entered into new management agreements with Care Group, L.L.C., a wholly-owned subsidiary of Care Realty, LLC. Under the management agreements, the Appellees are obligated to pay a 5% management dicent fee to Care Group, L.L.C. The Appellees made

11

their first payment in the amount of $237,182 (for the period March 7, 2014 through and including March 31, 2014) on April 1, 2014. The Appellees made their second payment in the amount of $280,517.87 on May 1, 2014.

E.     **<u>Funding Under the Back-Stop Agreement</u>**

26.    Pursuant to Section 4.2 of the Plan, for so long as each Appellee shall continue to own and operate a facility, and subject to the terms of the CBA Rejection Order, Care Realty, LLC agreed to make such funds available to the applicable Appellee to meet operating shortfalls. In March 2014, Care Realty, LLC contributed $575,000 to cover operating shortfalls. In April 2014, Care Realty, LLC contributed $653,000 to cover operating shortfalls. The Appellees project that in May 2014, Care Realty, LLC will be required to contribute approximately $200,000 to cover operating shortfalls.

27.    Under Sections 3 and 4 of the Backstop Funding Agreement, the vacating or reversal of the Confirmation Order is a Termination Event (as defined in the Backstop Funding Agreement) which terminates all of the Affiliates' obligations under the Backstop Funding Agreement, including, but not limited to, funding of ongoing operating losses, unless such Termination Event is waived. If the Confirmation Order is vacated or reversed, the Affiliates will not waive the Termination Event and will cease performing under the Backstop Funding Agreement. Without access to the Credit Facility and without the Affiliates

12

performing under the Backstop Funding Agreement, the Appellees will be without sufficient funds to operate and will be forced to close their operations to the detriment of their employees, vendors and patients.

28. The cornerstone of the Plan is the Affiliates' agreement to (i) waive $31 million in claims against the Appellees and their estates, (ii) fund the $500,000 Plan Distribution Contribution Amount, (iii) back-stop obligations set forth in the Plan, including distributions to Allowed Class 5 Claims in the amount of $3 million, and (iv) make such funds available to the applicable Appellee to meet operating shortfalls post Effective Date in the amount of approximately $8 million. Further, in the event the NLRB obtains a final non-appealable judgment against the Appellees on the Backpay Claims in the ALJ Proceedings, Care One, LLC shall contribute additional funds to the Plan Distribution Contribution Amount such that the Plan Distribution Contribution Amount equals $5 million.

29. The Affiliates contributed in excess of $60 million in consideration towards the Plan in exchange for a release and the attendant assurance that the Affiliates would not be required to expend any additional amounts litigating or satisfying the NLRB's claims against the Debtors. Indeed, the purpose of the Affiliates' significant contribution was to ensure that they would be free from the constant warfare. Challenging the Confirmation Order approving the Plan and the integrated other Orders on appeal at this point could cause significant harm to the

Affiliates and render the benefits of their bargain non-existent, while at the same time placing them back in the constant warfare.

### F. Post-Emergence Transactions

30. Since the Effective Date, numerous vendors, customers and other persons and entities have commenced, modified or expanded their business relationships with Appellees in reliance on the Plan and the successful conclusion of the Chapter 11 Cases. For example, the Appellees and related entities are in discussions with HUD to provide financing on certain non-Appellee properties owned by Care Realty, LLC. Those discussions started after the Effective Date and I understand from HUD that such discussions were driven by the successful conclusion of the Chapter 11 Cases.

31. In light of the numerous material and interrelated transactions that were completed pursuant to, and in reliance on the confirmation of, the Plan on and shortly after the Effective Date, granting the relief requested by the Appellants would, at a minimum, severely undermine the now consummated Plan.

32. For example, the relief sought by the Appellants would potentially implicate the recovery of distributions and payments (exceeding $2,900,000) made in cash to numerous creditors and professionals under the Plan since on or shortly after the Effective Date. Recovering distributions and disrupting the Appellees' relationships yet again, including those that serve as the lifeblood of the Appellees'

businesses, will destroy the confidence of these parties in the Appellees' ability and commitment to meet their respective obligations and diminish the value of the Appellees' business enterprise.

33. For these reasons, challenging the Confirmation Order approving the Plan at this point could cause profound economic harm to the Appellees and to all of those stakeholders and third-parties that have relied on the Appellees' emergence.

34. Given the considerable number of transactions consummated in reliance on the Plan, it is difficult to conceive of a way to unwind the transactions and return the Appellees and their creditors to their pre-emergence positions. Granting the Appellants' relief, in light of the consummated Plan, would be impractical, extremely costly and funding to unwind the consummated Plan does not exist. Further, granting the Appellants' relief would likely prejudice and create considerable uncertainty for the Appellees' creditors, the Affiliates, employees, patients and vendors, many of whom have waited beyond expectation for satisfaction of their claims.

35. In addition, the 1113 Orders and the Claims Objection Order were an integral part of the Plan (and indeed the entry of the 1113(c) Order was a condition precedent to the Plan's effectiveness). Absent entry of those orders, the Appellees would have been forced to liquidate. The modifications approved by the 1113(c)

Order enabled the Appellees to obtain exit financing and successfully emerge from Chapter 11.  In addition, reversal of the 1113 Orders and Claims Objection Order would undermine the Plan and threaten the Appellees' viability.  Reinstating the old terms and conditions of the collective bargaining agreements in the event of a reversal would cause the Appellees to suffer significant losses and close down their facilities.

36.   Thus, I believe that granting the Appellants' requested relief would reverse the Appellees' successful emergence from Chapter 11 and cause the disastrous consequences found by Judge Steckroth based upon the compelling evidence before him.  Those consequences include, but are not limited to, closing five (5) facilities that care for the elderly, relocation of sick and frail elderly patients, and termination of hundreds of employees.

37.   Therefore, after carefully considering the relevant facts, it is my view that granting the relief requested by the Appellants would be unfair, impractical and inequitable to the Appellees, their numerous stakeholders and other parties in interest.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Dated:  May 19, 2014              */s/ Victor Matthew Marcos*
                                  VICTOR MATTHEW MARCOS

51689/0001-10520526v2

17